[Cite as *Rupp v. Premier Health Partners*, 2025-Ohio-986.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| CHRISTOPHER REID RUPP, ET AL. | : | |
| | : | |
| Appellants | : | C.A. No. 30154 |
| | : | |
| v. | : | Trial Court Case No. 2018 CV 1916 |
| | : | |
| PREMIER HEALTH PARTNERS, ET AL. | : | (Civil Appeal from Common Pleas Court) |
| | : | |
| Appellees | : | |

· · · · · · · · · ·

O P I N I O N

Rendered on March 21, 2025

· · · · · · · · · ·

ADAM V. SADLOWSKI, KELLY MULLOY MYERS & PAIGE E. RICHARDSON, Attorneys for Appellants

TERRY W. POSEY, JR. & ANTHONY V. GRABER, Attorneys for Appellee Kenneth D. Christman, M.D.

JEFFREY S. SHARKEY & ERIN E. RHINEHART, Attorneys for Appellees Premier Health Partners

· · · · · · · · · · · ·

HANSEMAN, J.

{¶ 1} Plaintiffs-Appellants, Christopher Reid Rupp, Ed Garrett, and Kristin Garrett

(collectively "Plaintiffs"), appeal from a summary judgment entered in favor of Defendants-Appellees, Premier Health Partners ("Premier") and Kenneth Christman, M.D., d/b/a Christman Plastic Surgery ("Christman").

{¶ 2} According to Plaintiffs, Premier violated R.C. 1345.02 and R.C. 1345.03 of the Ohio Consumer Sales Practices Act ("CSPA") by failing to disclose material and substantial facts about Christman, including that he did not work for Premier and was an independent contractor, that he did not accept private insurance and was not part of any insurance network, that he engaged in balance billing, and that he billed at substantially higher rates than similarly situated physicians would charge for the same services.

{¶ 3} Plaintiffs further contend that, even after receiving complaints about Christman's failure to disclose his billing practices and engaging in balance billing, Premier violated the CSPA by failing to implement procedures to ensure Christman complied with contractual obligations he had with Premier. Finally, the Garretts argue that Premier made materially false representations by telling them that Christman accepted insurance and would not be on the Miami Valley Hospital ("MVH") call schedule if he did not.[1]

{¶ 4} Regarding Christman, Plaintiffs argue that the trial court erred in granting summary judgment on their fraud claims against him because they established at least genuine issues of material fact about whether he committed fraud. Plaintiffs also contend the trial court erred in granting summary judgment on their breach of contract

---

[1] The events involved in this case took place at MVH, where Christopher Reid Rupp ("Reid") and Nicholas Garrett were brought for emergency treatment. MVH is part of Premier and, where appropriate, will be referenced rather than Premier.

claim against Christman. Specifically, they maintain they were intended third-party beneficiaries of 2010 independent contractor agreements between MVH and Dr. Christman. These contracts imposed certain obligations on Christman, including disclosing his billing practices to patients, charging reasonable fees to patients, and making every effort to reasonably work with patients concerning fees.

{¶ 5} After reviewing the record, we find that the trial court did not err in granting summary judgment to Premier, because it had no duty to inform Plaintiffs about the billing practices of an independent contractor. Furthermore, assuming for the sake of argument that Premier had such a duty, it did inform Plaintiffs, both by posting signs in the hospital and through a consent form that Plaintiffs signed. In signing the consent form, Plaintiffs acknowledged that physicians administering treatment may be independent contractors and that the physicians would separately bill for their services. While Plaintiffs stated they either did not read the consent form or merely skimmed it, the form did provide disclosure.

{¶ 6} On the other hand, we conclude that the trial court erred in granting summary judgment to Christman on the fraud claims, because there are genuine issues of material fact concerning whether Christman acted fraudulently and with actual malice, in conscious disregard of Plaintiffs' rights. In addition, the trial court erred in granting Christman summary judgment on Plaintiffs' claims for breach of contracts that Christman had with MVH. Based on the contract language, Plaintiffs were clearly intended third-party beneficiaries of the contracts and could assert breach of contract claims against Christman.

{¶ 7} Accordingly, the summary judgment in favor of Premier will be affirmed, and the summary judgment in favor of Christman on the fraud and breach of contract claims will be reversed. This cause will be remanded to the trial court for further proceedings.

I. Facts and Course of Proceedings

{¶ 8} In May 2018, Plaintiffs filed a class action complaint against Premier and Dr. Christman, alleging violations of the CSPA, violations of the Ohio Corrupt Practices Act, common law fraud, negligent misrepresentation and concealment, civil conspiracy, and unjust enrichment. All the claims (other than the CSPA claim) were individual and class claims against both Premier and Christman; the CSPA claim was brought individually only against Premier.

{¶ 9} According to the complaint, Reid was injured in a bicycle accident in December 2016 and was transported from a hospital in Oxford, Ohio, to MVH. Reid's family chose MVH because it was near the Rupp family residence, accepted their insurance, and was an in-network provider. At that time, Christman was the on-call surgeon, and neither MVH nor Christman told Rupp or his family that Christman did not accept any insurance, was not in-network, and engaged in "balance billing practices."

{¶ 10} Reid's insurer paid for all hospital costs, which exceeded $70,000, except for $19,108 of Christman's bill. This was because Christman did not accept insurance and was considered out of network. The complaint further alleged that Christman inflated his charges for medical services by a factor of 10, and Reid's insurance carrier eventually sent Reid a check for $1,823.56 as the amount allowed for an in-network

provider at MVH for the surgery. Christman accepted the check but then sent the Rupps a new invoice for more than $17,000. When they failed to pay, Christman threatened them with "protracted and unpleasant collection efforts" and later placed the account with a third-party debt collector, which began collection activities and reported the debt to credit agencies.

{¶ 11} Similarly, the Garretts' son was injured in an auto accident in October 2016 and was transported to MVH, which was within their insurance network. MVH presented Christman as the doctor who would perform surgery, and again, the Garretts were not informed that Christman did not accept insurance, was not in network, and engaged in balance billing. The complaint alleged that while the Garretts' insurer paid for all other bills and did pay Christman over $13,000 for his services, Christman billed the Garretts $9,458.50 in excess of what a similarly situated physician would have charged. Christman threatened the Garretts when they did not pay the excess amount.[2]

{¶ 12} The complaint further alleged that Premier and Christman had knowingly and willfully entered into a scheme that let Christman perpetuate his billing scheme on Plaintiffs and other putative class members, and that Christman, with Premier's knowledge and approval, failed to disclose to patients that he does not accept insurance, that he is not "in-network," and that he engages in balance billing practices until his office sends a bill, which is often weeks or months after he has performed medical services. Plaintiffs also alleged that both Premier and Christman had received numerous

---

[2] The actual amount the insurer paid Christman was around $16,580, which included his assistance in another surgeon's operation, which occurred while the Garretts' son was in the hospital.

complaints and grievances over the years about their illegal and unethical conduct but had continued the scheme because they gained financially by continuing to generate increased medical fees.

{¶ 13} The complaint also set forth class allegations, outlined the claims for relief, and requested various relief including class certification, damages (both compensatory and punitive), attorney fees, pre- and post-judgment interest, and other relief.

{¶ 14} In July 2018, Premier responded by filing a motion to dismiss the complaint pursuant to Civ.R. 12(B)(6). Plaintiffs then received permission to file an amended complaint and did so in August 2018. The amended complaint included an additional individual and class claim against Premier for negligent credentialing as well as an intended third-party beneficiary contract claim against Christman. Subsequently, both Premier and Christman filed motions to dismiss that complaint, and Plaintiffs responded. In February 2019, the court granted Premier's motion to dismiss with respect to negligent credentialing but denied the rest of the motions to dismiss. Decision and Entry Denying in Part and Granting in Part Motions to Dismiss Complaint (Feb. 4, 2019), p. 2.

{¶ 15} After the court's decision, Premier and Christman filed answers to the amended complaint, and Christman asserted a counterclaim against Plaintiffs for the amounts alleged to be owed for his medical services. Shortly thereafter, Christman filed an amended answer and counterclaim. Premier then received permission to file an amended answer and did so in July 2019, adding additional affirmative defenses. Also in July 2019, Plaintiffs sought leave to amend the complaint again in order to remove the negligent credentialing claim and to assert new fraud allegations. The court granted this

motion in early February 2020; Plaintiffs then filed a second amended complaint on February 7, 2020. Both defendants again filed answers.

{¶ 16} In July 2020, Premier and Christman filed a joint motion asking the court to order that motions for summary judgment and class certification be filed under seal, and the court granted the motion. Premier then filed its summary judgment motion on August 14, 2020; the same day, Plaintiffs filed a motion for class certification. Plaintiffs responded to the summary judgment motion on September 28, 2020, and that day, Premier and Christman replied to the class certification motion. In October, Christman also filed summary judgment motions on the claims against him and on his counterclaims.

{¶ 17} By April 2021, the parties had filed all responsive memoranda relating to both the summary judgment motions and class certification, and the court had also held a class certification hearing. In June 2021, the court denied the class certification motion, and in July 2021, it granted all the defense motions for summary judgment other than Christman's summary judgment motion on his counterclaims. Plaintiffs appealed from the summary judgment decision but did not appeal from denial of class certification.

{¶ 18} The appeal was dismissed at Plaintiffs' request in September 2021. *See Rupp v. Premier Health Partners*, Montgomery C.A. No. 29216 (Sept. 8, 2021). After that, the trial court filed a decision granting Christman's summary judgment motion in part and denying it in part. In this regard, the court stated:

> The Court finds there are genuine issues of material fact regarding
> Dr. Christman's claim that plaintiffs owe him compensation for medical
> services for breach of their contract to compensate him for the amount

asserted to be due after payment by their insurer. The Court rejects Dr. Christman's argument that he still has a claim for unjust enrichment or quantum meruit, despite seeking recovery for breach of contract, as held in *Christman v. Day*, [Montgomery C.P. No. 2017 CV 3365 (Sept. 10, 2021)] *supra*. Also, the Court finds there are genuine issues of material fact regarding whether the relationship of physician and patient may have required a duty to disclose to the patient how the physician will be compensated for services. Such a duty could impact the extent to which the patient is obligated to pay more than what insurance pays for the services.

Accordingly, Dr. Christman's motion for summary judgment in his favor with respect to his counterclaims for money alleged to be owed for services rendered, is GRANTED IN PART regarding plaintiffs' arguments that "balance billing" was unlawful precluding his counterclaims and DENIED IN PART, leaving the finder of the facts to decide genuine issues of fact regarding the alleged breach of contract by plaintiffs and whether the failure to disclose so violated the special physician and patient relationship, that it may impact the obligation of the patients to pay more than the amount paid by health insurers.

Decision and Entry Granting in Part, and Denying in Part, Defendant Christman's Motion for Summary Judgment on Counterclaims (Jan. 8, 2022), p. 3-4.

{¶ 19} Subsequently, Christman filed a motion for reconsideration, but the court

denied his motion in March 2022 and set an August 2022 trial on the counterclaims. In August, the court denied Christman's motion to bifurcate the Plaintiffs' trials but granted his motion for a separate trial on attorney fees and costs he was claiming. *See* Decision and Entry on Motions To Bifurcate And Quash Subpoenas (Aug. 17, 2022), p. 1.

{¶ 20} Thereafter, the trial was continued, and Christman asked the court for permission to file an amended counterclaim adding an additional defendant, but this was denied in June 2023. Ultimately, trial was set for April 1, 2024. After Christman asked for clarification of the issues for trial, the court filed the following decision:

> The Court has reviewed the procedural posture of this matter set for a jury trial on April 1, 2024. This Court found there were genuine issues of material fact remaining with regard to Christman's counterclaim. The Court advises the parties that if the jury finds Rupp and/or Garretts liable to Christman, the amount of damages would be limited to the unpaid balance billed to them and collection fees or attorney fees related directly to the counterclaim Christman filed and not the defense of the claims made by Rupps and Garretts against him and others in this case.

Entry Clarifying Issue for Trial (Mar. 31, 2024), p. 1.

{¶ 21} The trial occurred on April 1, 2024, as scheduled. After Christman (who had been realigned as a plaintiff) concluded his case, the court granted the Plaintiffs/Counterclaim Defendants' motion for a directed verdict. Subsequently, the court filed a decision reflecting its reasoning. *See* Decision and Entry Granting Motion for Directed Verdict; Final Judgment (Apr. 26, 2024). On May 14, 2024, Christman

appealed from the court's decision, and the appeal was docketed as Montgomery C.A. No. 30146. On May 22, 2024, Plaintiffs appealed from the court's July 31, 2021 summary judgment decision, and that appeal (the appeal we address herein) was docketed as Montgomery C.A. No. 30154. In late August 2024, we issued an order transferring the summary of docket and journal entries and all original papers from the prior appeals (Case Nos. 29016 and 30146) to this appeal. Amended Order Sustaining Motion to Correct the Record (Aug. 28, 2024). However, we did not consolidate the two pending appeals, and this opinion deals only with the Plaintiffs' claims against Premier and Christman.

{¶ 22} With the above background in mind, we turn to the Plaintiffs' assignments of error.

## II. Dismissal of CSPA Claims Against Premier

{¶ 23} Plaintiffs' first assignment of error states that:

> The Trial Court Erred by Dismissing Rupp/Garretts's Claims Under
>
> the Ohio CPA Against Premier.

{¶ 24} Under this assignment of error, Plaintiffs contend that Premier violated R.C. 1345.02 and R.C. 1345.03 of the CSPA by failing to disclose material and substantial facts about Christman, including: that he did not work for Premier and was an independent contractor; that he did not accept private insurance and was not part of any insurance network; that he engaged in balance billing; and that he billed at substantially higher rates than similarly situated physicians would charge for the same services. They further

maintain that, even after receiving complaints about Christman's failure to disclose his billing practices and continued engagement in balance billing, Premier violated the CSPA by failing to implement procedures to ensure Christman complied with contractual obligations he had with Premier. Finally, the Garretts argue that Premier made materially false representations by representing to them that Christman accepted insurance and would not be on the call schedule if he did not.

{¶ 25} In granting summary judgment, the trial court first discussed the fraud claim and noted that: (1) "The billing practices are ancillary to the medical care and treatment that forms the essence of the relationship between a hospital and a patient"; (2) Premier did not have a duty "to disclose Dr. Christman's status with regard to coverage under health insurance that Premier accepted because it had a contract with Dr. Christman to provide medical services on Premier's patients"; (3) Plaintiffs' arguments were "barred by the economic loss rule that prevents recovery on a tort claim for losses resulting from a breach of contract"; (4) there is no genuine issue of material fact in dispute that neither Dr. Christman nor Premier were intending to mislead the plaintiffs and induce them to rely on Premier's acceptance of health insurance and by not disclosing that Dr. Christman's services were not so covered"; and (5) "since plaintiffs did not pay Christman's bills that they allege constitute an essential element of their claims, there is no injury in fact demonstrated on the record before the Court." Decision and Entry Granting Motions for Summary Judgment (July 13, 2021) ("SJ Decision"), p. 5-6.

{¶ 26} After rejecting the fraud claims, the court stated briefly about the CSPA claims that:

The Court concludes that plaintiffs have not presented evidence supporting a prima facie showing that Premier or Christman committed material misrepresentation, deception or omissions. Plaintiffs needed emergency surgery and Christman answered the call and provided treatment. The purpose was to obtain the emergency medical services and expertise that Christman provided by being available as a maxillofacial surgeon to drop everything and come to the emergency department. The Court finds that there is no genuine issue of material fact in dispute that Premier and/or Christman are not subject to liability to plaintiffs for violating this statute. Premier and Christman are entitled to judgment as a matter of law.

*Id.* at 6.

**{¶ 27}** Before addressing Plaintiffs' arguments (which are limited only to the CSPA and not the fraud claim against Premier), we will outline the standards that apply to reviewing summary judgment decisions.

### A. Summary Judgment Review

**{¶ 28}** Ohio law is well-settled concerning summary judgment and applicable review standards. "The procedure set forth in Ohio Civ.R. 56 is modeled after the federal rule that authorizes summary judgment in appropriate cases." *Byrd v. Smith*, 2006-Ohio-3455, ¶ 10. " 'Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those

claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.' " *Id.* at ¶ 11, quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

{¶ 29} "Summary judgment is appropriate if (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." S*tate ex rel. Duncan v. Mentor City Council*, 2005-Ohio-2163, ¶ 9, citing T*emple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). " 'As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

{¶ 30} To review summary judgment decisions, appellate courts apply a de novo standard of review. *A.J.R. v. Lute*, 2020-Ohio-5168, ¶ 15. In this type of review, an appellate court independently reviews evidence without deferring to the trial court's findings. *Smathers v. Glass*, 2022-Ohio-4595, ¶ 30, citing *Wilmington Savs. Fund Soc. v. Salahuddin*, 2020-Ohio-6934, ¶ 20 (10th Dist.). Thus, a reviewing court "examines the evidence available in the record, including deposition or hearing transcripts, affidavits, stipulated exhibits, and the pleadings, *see* Civ.R. 56(C), and determines, as if it were the

trial court, whether summary judgment is appropriate." *Id.*, citing *Wilmington Savs.* at ¶ 19. In considering the propriety of summary judgment here, we have reviewed all these materials, including thousands of pages of depositions and exhibits the parties filed.

### B. Applicable Substantive Law

{¶ 31} The claims against Premier were brought under R.C. 1345.02 and R.C. 1345.03, which are part of the CSPA. Ohio courts have held that "[w]hile transactions with physicians are exempted from the CSPA, a transaction between a service provider such as a hospital and the consumer is not clearly exempted." *Summa Health Sys. v. Viningre*, 140 Ohio App.3d 780, 795 (9th Dist. 2000), citing *Elder v. Fischer*, 129 Ohio App.3d 209, 215 (1st Dist. 1998), and *Thorton v. Meredia Suburban Hosp.* 1991 WL 244206 (8th Dist. Nov. 21, 1991). The first asserted provision, R.C.1345.02(A), provides that: "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." R.C. 1345.02(B) includes a short list of deceptive acts but does not limit the scope of R.C. 1345.02(A). Therefore, the listed acts are not exclusive.

{¶ 32} "When claiming a violation of R.C. 1345.02(A), a consumer does not have to establish that the supplier intended to be unfair or deceptive." *Wall v. Planet Ford, Inc.*, 2005-Ohio-1207, ¶ 21 (2d Dist.), citing *Mannix v. DCB Serv., Inc.*, 2004-Ohio-6672, ¶ 18 (2d Dist.). Instead, " '[i]t is how the consumer views the act or statement which determines whether it is unfair or deceptive.' " *Mannix* at ¶ 18, quoting *Frey v. Vin Devers, Inc.*, 80 Ohio App.3d 1, 6 (6th Dist. 1992). "The basic test is one of fairness; the act need not rise to the level of fraud, negligence, or breach of contract." *Wall* at ¶ 21,

citing *Thompson v. Jim Dixon Lincoln Mercury, Inc.*, 1983 WL 4353, *1 (12th Dist. Apr. 27, 1983). To decide if particular acts are deceptive or unfair, courts look at the facts and circumstances of each case. *Id.*

**{¶ 33}** The other involved section, R.C. 1345.03(A), states that, "No supplier shall commit an unconscionable act or practice in connection with a consumer transaction." While this statute does not list specific unconscionable acts, it does provide circumstances to be considered in deciding if suppliers have taken advantage of consumers. *See* R.C. 1345.03(B). "In order to recover under R.C. 1345.03, a consumer must show that a supplier acted unconscionably and knowingly." *Trutschel v. Kettering Med. Ctr.*, 2009-Ohio-3302, ¶ 31 (2d Dist.), citing *Karst v. Goldberg*, 88 Ohio App.3d 413, 418 (10th Dist. 1993). Unlike the state of mind in R.C. 1345.02, "scienter is a necessary element and must be proven prior to an unconscionable act being found under R.C. 1345.03." *Bierlein v. Bernie's Motor Sales, Inc.*, 1986 WL 6757 (2d Dist. June 12, 1986). *Accord Trutschel* at ¶ 22. As defined in the CSPA, "knowledge means actual awareness, but such actual awareness may be inferred where objective manifestations indicate that the individual involved acted with such awareness." R.C. 1345.01(E).

**{¶ 34}** R.C. 1345.09(A) also provides that, "[w]here the violation was an act prohibited by section 1345.02, 1345.03, or 1345.031 of the Revised Code, the consumer may, in an individual action, rescind the transaction or recover the consumer's actual economic damages plus an amount not exceeding five thousand dollars in noneconomic damages." Therefore, contrary to Premier's position in its brief, Plaintiffs' claims should not be rejected because they have not yet paid Christman the balance due on his account

and have not suffered any injury. *See* Premier Brief, p. 9. First of all, when summary judgment was rendered, Plaintiffs were still being sued by Christman for the balances due on their bills. Furthermore, while Plaintiffs prevailed at trial on Christman's counterclaims, that decision could potentially be reversed on appeal. Finally, Plaintiffs also had a statutory right to claim noneconomic damages.

### C. Application of the Law and Facts

#### 1. The Parties' Arguments

{¶ 35} Before discussing the facts, we will outline the parties' arguments. As noted, according to Plaintiffs, Premier violated the CSPA failing to disclose material facts about Christman, including: that he was not a Premier employee; did not accept private insurance; was not in-network; engaged in balance billing; and charged substantially higher rates than similarly situated physicians. Plaintiffs also argue that Premier wrongly failed to implement processes to ensure Christman complied with his contract after receiving "numerous" complaints. And finally, Plaintiffs rely on Premier's alleged false representation to Kristin Garrett that Christman accepted insurance and would not be on the call schedule if he did not. Plaintiffs' Brief, p. 12.

{¶ 36} In response, Premier contends: (1) it did not have a duty to disclose Christman's billing practices; (2) assuming it had a duty, it complied by: (a) contractually requiring Christman to disclose his billing practices; and (b) notifying prospective patients that physicians may be independent practitioners and not in-network, and that patients are responsible for paying for services not covered by insurance; (3) Garrett admitted a

Premier employee did not tell her that Christman was in-network with Garrett's insurer; (4) Premier did not violate the CSPA by having Christman on the call schedule because it was required as a Level 1 Trauma Center to have physicians with certain skills on call and Premier had only one patient complaint about Christman's billing practices after imposing stringent requirements on him; and (5) Plaintiffs failed to present evidence that Premier's conduct impacted their decisions.

## 2. The Facts

{¶ 37} Bearing in mind that precluding summary judgment relies on genuine and material factual disputes, the following facts were presented in the depositions and exhibits submitted to the court. We construe these facts in Plaintiffs' favor.

{¶ 38} Dr. Christman is a plastic surgeon who has been in private practice since completing his residency in 1981, has had medical privileges at MVH since that time, has been a solo practitioner since 1985, and does general plastic surgery, including maxillofacial surgery ("max face") (involving not only soft tissues, but bony structures of the face and head), hand surgery, reconstructive procedures, and cosmetic procedures, Christman Deposition, 8, 10, 25, and 27.

{¶ 39} At MVH, the bylaws provide that all physicians have the right to take call for unattached patients for services the physicians offer. MVH has no obligation to pay the physician for the call, but physicians do have the right to be on call. In other situations, the hospital will sometimes have written contracts with physicians to be on call because the call need is so great and very few physicians are electing to take call. Dr. Belcastro

Deposition, 13.

{¶ 40} As a Level 1 Trauma Center, MVH is required to have certain specialties on call 24 hours a day, seven days a week. Plastic surgery is one such specialty, and Christman was one of the medical staff members who was on the call schedule. His first independent contractor agreement with MVH for max face was dated January 1, 2001, and the first such agreement for plastic surgery ("plastics") was dated January 1, 2004. Diane Pleiman Deposition, 25. Generally, Christman was on max face call for seven days at a time and on plastics call for 14 consecutive days. He would be compensated at a fixed rate whether he was called or not. If called, Christman would also be able to bill for services he rendered. At the time of the events involved here, the on-call payment for max face was $1,265 per 24-hour day; for plastics, the fee was $1,950 per week. Christman at 35, 38-39, 44-46, 271, 303, and 344.

{¶ 41} Since the late 1980s or early 1990s, Christman did not have contracts with any insurance companies. He did have a Medicare contract, but that program is not involved in this case. *Id.* at 81-83. While Christman did accept payments from insurers, he engaged in a practice called "balance billing," which "occurs when a provider of medical supplies or services charges or collects, from a beneficiary of a government or private health insurance plan, or from some other payor, an amount in excess of the amount that is reimbursable under the applicable health insurance plan. In practice, this occurs when a provider of medical supplies or services accepts partial payment from a private or government insurance plan, then bills the patient or other entity for the difference between that reimbursement and the provider's usual, customary, or standard

charge." *Propriety and Use of Balance Billing in Health Care Context,* 69 A.L.R.6th 317, § 1, fn.1 (2011).

{¶ 42} Medicare prohibits "balance billing patients of providers who have entered provider agreements to provide services to Medicare recipients, generally requiring medical providers to agree to accept Medicare payments as payment in full for their services." *Id.* at § 2, citing 42 U.S.C. 1395cc(a)(1)(A) and 42 C.F.R. 489.21(a). Individual states, including Ohio, have enacted similar laws. *E.g.,* R.C. 4769.02. Some states have also banned or regulated balance billing. *See* CA HLTH & S 1371.9. Ohio has not done so.

{¶ 43} However, in 2020, Congress passed the "No Surprises Act" ("NSA") "to protect patients from surprise medical bills in situations where they have no choice over whether their provider is in-network." *Texas Med. Assn. v. United States Dept. of Health & Human Servs.*, 120 F.4th 494, 501 (5th Cir. 2024), citing Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 2758-890 (2020). "The NSA prohibits out-of-network health care providers from billing health plan members directly for certain items or services." *See* 42 U.S.C. §§ 300gg-131(a) (emergency services); 300gg-132 (non-emergency services). A provider must instead seek compensation from the patient's health care plan. Under the act, upon receiving a request for payment from a provider, the patient's health care plan determines whether and in what amount it will pay for the services. If the provider and health care plan cannot agree on an amount, the act provides for an independent dispute resolution ('IDR') process in which a private arbitrator ('IDR entity') selects between amounts submitted by the provider and the health plan."

*Neurological Surgery Practice of Long Island, PLLC v. United States Dept. of Health & Human Servs.*, 682 F.Supp.3d 249, 255 (E.D. N.Y. 2023).

**{¶ 44}** Under the NSA, a " 'nonparticipating provider' means, with respect to an item or service and a group health plan or group or individual health insurance coverage offered by a health insurance issuer, a physician or other health care provider who is acting within the scope of practice of that provider's license or certification under applicable State law and who does not have a contractual relationship with the plan or issuer, respectively, for furnishing such item or service under the plan or coverage, respectively." 42 U.S.C. 300gg-111(a)(3)(G)(i). Thus, after NSA became effective, balance billing would be prohibited in emergency situations. The law also requires health care providers and health care facilities to make various disclosures about balance billing prohibitions. *See* 42 U.S.C. 300gg-133.

**{¶ 45}** Returning now to the factual background, Christman's original on-call contracts with MVH began in the early 2000s. From 2007 until September 2012, Dianne Pleiman was vice-president of operations for MVH, and part of her responsibility was the MVH emergency trauma center. This included physician contracts. In 2008, Pleiman became aware of Christman's balance billing practices, including the fact that he did not accept insurance (or was not in network with insurers). She was aware of this because MVH had received some complaints through its customer relations department. That department then referred the complaints to Pleiman. Pleiman was aware of five complaints: one in 2006 before she became vice-president, two complaints (one in 2007, and another perhaps in 2008), and two complaints in 2008 concerning Bureau of Workers'

Compensation ("BWC") patients.   Pleiman at 10, 31-37, and 191.

**{¶ 46}** Pleiman's initial response in 2007 was to talk with Christman about the complaints and try to help resolve them.   However, in 2008, Premier received complaints from the BWC about Christman's billing practices, i.e., he had provided services for two BWC patients and had balance billed them.   When Pleiman discussed these complaints with Christman, the conversation was the same, i.e., that Premier had received these complaints about his billing practices and not accepting insurance.   The outcome of the conversations was that Christman was not going to change his billing practices.   At this point, Premier had concerns about letting Christman continue on the call schedule due to his billing practices.   This related to patient complaints and Christman's lack of disclosure to patients that he did not contract with private insurance companies.   *Id.* at 34 and 38-39.

**{¶ 47}** During 2007 and 2008, Pleiman had conversations with customer relations and with other Premier personnel about what was going on.   These people included: Pleiman's boss, Bobbie Gerhart (MVH's chief operating officer); the section chairs for max face and plastics; Dr. Pacenta, the chief of staff for the medical staff; Mark Shaw (MVH vice-president of managed care); Paula Burton (director of customer relations); and Gary Collier (chief medical officer).   Pleiman at 10 and 44-46.

**{¶ 48}** In late December 2008, Dr. Pacenta wrote a letter to Christman expressing concern about his billing practices.   Christman responded on January 2, 2009, stating, among other things, that it was "unreasonable for Premier or any hospital to require its on-call physicians to accept the insurance that Premier accepts."   Subsequently, a

meeting was held in early 2009 at which Pleiman, Christman, Dr. Collier, and Gerhart were present. At the meeting, Christman stated that he was not going to change his billing practices; as a result, MVH decided it was going to terminate his contract. In addition to attending this meeting, Pleiman reached out to Christman to discuss the issues regarding customer complaints and the BWC. In this regard, Christman faxed Pleiman a letter dated April 9, 2009, but he did not respond with any offer of compromises. Christman at 210-211 and 216; Pleiman at 57-59 and 72; Exs. J and M. Pleiman was the one responsible for making the decision to terminate Christman. However, before doing so, she conferred with MVH's legal counsel. She also consulted her supervisor, Gerhart, and Dr. Collier, the chief medical officer, who were both supportive of her decision. Pleiman at 48-50 and 77.

{¶ 49} Pleiman also conferred with the section chiefs, who oversaw scheduling of on-call services. These doctors were concerned about removing Christman from the schedule since that would increase the burden on the remaining physicians. Nonetheless, MVH decided to terminate Christman's on-call contracts. *Id.* at 80-81.

{¶ 50} On May 7, 2009, MVH's vice-president of corporate counsel sent Christman a certified letter giving Christman notice of termination. The notice stated that MVH was going to cancel the independent contractor agreements that it had with Christman for plastics and max face call services. According to Christman, when he received this letter, he had no idea why he was being terminated. Pleiman also sent Christman a letter on May 7, stating that Christman's section chiefs had notified her that, beginning that day, Christman would no longer be on the call schedule for max face or plastics. After

Christman's on-call contracts were terminated, Christman wrote several letters. On May 12 and 20, 2009, he wrote to Mary Boosalis, the MVH CEO; he also wrote Pleiman on May 12. In addition, on May 27, 2009, Christman sent a letter to Dale Creech, then MVH chief legal counsel, about the termination notice. Christman requested a formal meeting, and on May 28, 2009, he attended a meeting in the MVH boardroom with Collier, Burton, Pleiman, and Boosalis. During that meeting, Christman reiterated his position on his billing practices, and MVH told him that based on those practices, it would not be willing to sign the same contract again that the parties previously had. Christman at 189-190, 210, 216, 218, 220-221, 231, 241-242, 252-253, 258-259, and 263; Pleiman at 76-78, 102-104, and 115; Exs. N, O, P, Q, R, and S.

{¶ 51} In the May 27 letter to Creech, Christman claimed the hospital had terminated his contract for "maxillofacial and plastic surgery emergency call without offering any reason." According to Pleiman, this was untrue, as the termination letter had quoted reasons from Dr. Pacenta's December 2008 letter, and the reasons for the termination were quite clear. The reasons were Christman's billing practices. Specifically, Pleiman's May 7, 2009 letter had referenced Pacenta's letter and stated that: "As he [Pacenta] indicated, your choice of billing practice causes devastating financial problems for patients of the hospital. Furthermore, the hospital has received at least one written complaint from a governmental agency regarding your billing practices. The hospital has also received several more patient complaints since Dr. Pacenta's letter as to your billing practices and the charges relative to your bills." Pleiman at 99-100 and 225-226; Exs. O and S.

{¶ 52} Creech also responded to Christman on June 8, 2009, stressing that "the decision was made not because of the Ohio Bureau of Workers' Compensation issues, but because you consistently declined to accept as payment in full (less co-pays and deductibles) payments from managed care companies, choosing instead to balance bill the patient at your retail charges." Pleiman at 108-110; Exs. S and U. Creech further said, "It is my understanding that Dr. Collier and others have discussed this dilemma with you on several occasions, but you are unwilling to change your position on this." According to Christman, Creech was lying, as Christman did not recall discussing this with Collier. He did not follow up with Creech to clarify. Christman at 270-273.

{¶ 53} In late June 2009, Pleiman again met with Christman. The meeting was precipitated by more of the same conversations around termination of the on-call contracts for max face and plastics. They again discussed the reasons why Premier decided to take Christman off the call schedules. This was not the first time Pleiman had communicated the reasons to Christman; she had communicated or had tried to communicate the reasons five to ten times previously. At this point, Pleiman had not yet decided whether to let Christman come back; it was an ongoing issue. Christman at 275-276; Pleiman at 115-118.

{¶ 54} After Christman was taken off the call schedule, there were discussions about reinstating him. There were many conversations with doctors on the call schedule about their burden because so few people could do the work. In addition, as a Level 1 trauma center, MVH was required to provide this coverage and there was a concern about doctors taking on more weeks of call, the burnout that could result, and potentially losing

more doctors. Consequently, by December 23, 2009, MVH was considering putting Christman back on the schedule if the parties could agree on contract terms. Ultimately, they were able to reach agreement, which resulted in new independent contractor agreements for max face and plastics. The agreements were made effective February 1, 2010, and lasted until February 1, 2013, at which time they would automatically renew unless the parties terminated the agreements. Christman at 302-303; Pleiman at 129 and 133-140; Exs. BB and CC, Section 3.

**{¶ 55}** The only material change in the new agreements (which were the same, other than the compensation amounts) was the addition of new Section 5. Pleiman at 139. This section provided as follows:

5. Billing and Professional Fees. As to any duties/services identified herein, Physician may bill for any patient services provided thereto. Physician shall be responsible for the coding, billing and collection of all professional fees generated by Physician under this Agreement and shall be entitled to retain all such fees collected. Hospital shall provide demographic and billing information to Physician necessary for Physician to bill the patient, provided that such requests for information are reasonable, timely and comparable to other such Physician requests to Hospital for similar information.

If Physician does not take patients['] third party insurance for the services provided under this Agreement, Physician agrees to the following:

(a) Physician will notify patient as soon as possible that he does not

take private insurance as payment for his services under this Agreement;

(b) In such notification, Physician will clearly provide to patient, in writing, his intent to work with the patient in resolving the bill, with contact names and numbers, and that he will not place the matter into collection until all reasonable efforts are made to resolve the billing issue;

(c) Physician will charge said patients amounts that are reasonable for his specialty in the area, taking into account the amount that patient would have had paid by third party insurance;

(d) Physician will make every reasonable effort to compromise any bill with patients receiving care under this Agreement.

Furthermore, Physician agrees that Hospital, in its sole discretion, may terminate this Agreement immediately if it believes that Physician has not issued reasonable charges and/or has not worked in a reasonable manner with patients to compromise bills related to the services under this Agreement. Physician agrees to defend, indemnify, and hold harmless Hospital, its officers, directors, employees and agents from and against any and all claims from any third party as a result of Physician's decision not to bill third party insurance for his services provided under this Agreement

Exs. BB and CCC (also labeled as PREMIER0000506-0000507).

**{¶ 56}** Section 8 of the agreement also stated, in relevant part, that:

8. Independent Status. Physician(s) shall act as independent contractors in the performance of duties under this Agreement. Hospital

shall neither have nor exercise any control over the methods by which Physician delivers or performs responsibilities. The sole interest of Hospital is to assure that the services shall be performed in a competent, efficient and satisfactory manner for the care and well being of the patient population.

*Id.* at PREMIER0000507.

{¶ 57} MVH's purposes in including the provisions in Section 5 of the February 2010 new agreements were to reduce the calls customer relations received about Christman's billing practices for MVH patients and to require Christman to disclose more information about his billing practices before providing service. MVH's goal was that if patients received the required disclosures, they could make more informed decisions about medical services being provided. Finally, if Christman had not agreed to the inclusion of Section 5 in his contracts, MVH would not have placed him back on the call schedule. As of the time of Pleiman's deposition in November 2019, the agreements were still in effect, and Christman was still working at MVH. Pleiman at 141, 150, and 152.

{¶ 58} Pleiman remained in her position until the end of September 2012, when she became the service line vice-president for neurosciences and oncology. After Christman returned to the call schedule in February 2010, Pleiman kept an eye on the plastics and max face call schedules, since a new contract was in place. She would reach out to Christman's office when he was going to be on call and make sure everything was going okay. During this time, Pleiman was not aware of any complaints coming into

customer service about Christman's billing practices. She therefore concluded that Christman was disclosing the information he needed to provide and was working with patients. Pleiman at 10-12, 156, 165-167, and 169.

{¶ 59} Pleiman's successor as vice-president of operations in 2012 was Kimberly Hensley. When Hensley took over, she and Pleiman reviewed the on-call contracts, but Hensley did not recall any specific discussion about Christman, other than that generally, this was a contract Hensley needed to keep an eye on because there had been complaints about his billing practices. However, because there had been no complaints since Christman signed the contract in 2010, Hensley did not institute any type of tracking or follow-up. Furthermore, Hensley was subsequently aware of only one complaint between 2010 and 2015. The 2015 complaint involved the family member of an MVH employee who was upset by receiving a large bill from Christman. Hensley said she had looked into it and believed it had been resolved. However, she did not recall the result. Hensley Deposition, 11, 15, 17, 30-33, 48-50, 55, and 152.

{¶ 60} Dr. Belcastro was the medical director of the MVH neonatal intensive care unit from about 2005 to 2015 and was elected as MVH chief of staff, serving in that role from 2014 to 2016. He then left clinical practice in August 2016 to assume the role of MVH chief medical officer, which was a fully administrative job. As chief of staff, Belcastro represented the medical staff in all affairs, including credentialing and renewal of hospital privileges. Other than Lisa Rupp's complaint in 2017, Belcastro was not aware of any complaints about Christman's billing practices, including during Christman's renewal process. Belcastro at 7, 10-11, 26-28, 31, and 54.

(a)  Nicholas Garrett

**{¶ 61}** Turning to the events leading to the lawsuit, Nicholas Garrett was involved in a serious automobile accident on October 26, 2016, and was transported by Care Flight to MVH.   He was admitted as an inpatient around 7:30 p.m.   That night, Christman was on max face call and was called into the hospital.   Christman's initial consultation with the Garretts was late in the evening on October 26, but he did not perform surgery until October 28.   Christman did not disclose his billing practices or that he did not accept insurance until November 9, 2016, which was after Garrett had been released from the hospital and came to Christman's office for follow-up treatment.   According to Christman, during his initial consultation, he does not disclose that he is not a hospital employee because that is not something that people ask.   Further, Christman said that it would be improper in emergency situations to disclose the fact that he did not accept private insurance, as that would violate the Emergency Medical Treatment and Active Labor Act ("EMTALA").   After a patient has stabilized, Christman might have that conversation, but most of the time it takes place at his office after the patient has been released from the hospital.   Christman at 57-58, 67, 88, 164-167, 171-173, 475, 479, 485, and 584; Christman Deposition Ex. 75; and Kristin Garrett Deposition, 88-89 and 104-105.

**{¶ 62}** "Congress passed EMTALA in 1986 in response to concerns over 'patient-dumping' – i.e., reports that hospitals were turning away indigent patients at emergency rooms, failing to provide the same kind of screening they would offer to a paying patient, and 'dumping indigent patients from one hospital to the next while the patients'

emergency conditions worsened.' " *Galuten on behalf of Estate of Galuten v. Williamson Cty. Hosp. Dist.*, 2021 WL 3043275, *5 (6th Cir. July 20, 2021), quoting *Bryan v. Rectors and Visitors of Univ. of Va.*, 95 F.3d 349, 351-352 (4th Cir. 1996).

**{¶ 63}** "EMTALA imposes two basic duties on hospitals: (1) provide an 'appropriate medical screening examination within the capability of the hospital's emergency department' to 'any individual [who] comes to the emergency department' to seek examination or treatment; and (2) for individuals who have an 'emergency medical condition,' to stabilize the condition before transferring or discharging the patient." *Id.*, quoting 42 U.S.C. 1395dd(a), (b)(1), and (c)(1), and citing *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir. 1990). The statute also applies to physicians and imposes administrative sanctions, including a civil penalty, for physicians who negligently violate EMTALA. However, federal courts have held that, while hospitals may be sued, there is no private right of action against physicians. *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 587 (6th Cir. 2009), discussing 42 U.S.C. 1395dd(d)(1) and 42 U.S.C. 1395dd(d)(1)(B).

**{¶ 64}** Kristin Garrett first learned that Christman was not in network two days after her son was released from the hospital. However, her insurer told her that since an emergency was involved, it would pay for Christman as if he were in the network. K. Garrett at 120-124. Christman's total bill of $44,672 included: $750 for the October 26 initial consultation in the emergency room; $41,153 for the October 28 surgery; and $2,859 for a procedure done on October 30. Garrett's insurer paid Christman a total of $16,580 for these charges, and the Garretts paid $1,302, for a total payment of $17,882.

After writing off around $17,331, Christman balance billed the Garretts for about $9,458. Christman at 591-594 and 607; K. Garrett at 248; Ex. 36 attached to Plaintiffs' response to Premier's summary judgment motion; and Defendant's Ex. 79, attached to Christman's October 12, 2020 summary judgment motion.

(b) Reid Rupp

{¶ 65} On December 6, 2016, Reid was injured in a bicycle accident at Miami University. After being taken to a local hospital, Reid was transported by ambulance to MVH, which was in network with his insurance. Reid's mother, Lisa, had insurance coverage through the Beavercreek City School District, which was self-insured; Anthem was the administrator. Reid arrived at MVH around 7:09 p.m., and Christman was called at some point after 9:45 p.m. At the time, Christman was on call for plastics but not for max face. After being called, Christman arrived at the hospital at about 11:30 p.m. and consulted with Reid and his family. Christman did not recall if he discussed the fact that he did not accept private insurance, but he would not normally do that, again because of his belief that EMTALA prohibited him from doing so. According to the Rupps, Christman never disclosed anything about insurance or his billing practices until after Reid was released from the hospital and they came to Christman's office for follow-up treatment on December 14, 2016. Christman stated that he discloses his billing practices to all his patients when they sign their patient agreement when they first come to his office. Christman at 136-137, 148-149, 300, 448, 454; Defendants' Ex. 125, RUPP 000173 and 000186; Lisa Rupp Deposition, 42, 47, 175-177, 216; and 219; Christopher Reid Rupp

Deposition, 52, 165, and 304. However, there was no evidence that Christman himself discussed anything about his practices; instead, patients were given forms containing some information. Christman at 320-321,326-327, 584-585, 607-608; Reid at 165-166; L. Rupp at 219, 221-222; and K. Garrett at 234.

**{¶ 66}** Christman billed the Rupps around $17,579 for his services in the hospital and a separate fee ($1,539) for a procedure done in his office (removal of arch bars), for a total of more than $19,000. The Rupps' insurer paid $1,823.56 for the hospital bill. This was the amount it would have paid for an in-network provider. It also paid $252.85 for the office procedure. Ultimately, Christman balance-billed the Rupps for more than $17,000. Christman at 541-542 and 602; Reid at 54, 57, 282, 314, and 317; L. Rupp at 48, 52, and 256; and Defendant's Ex. 41.

## (c) MVH Disclosures

**{¶ 67}** MVH posts disclosure signs about various topics like EMTALA and attending physicians in the triage area of the emergency room where patients can see them when they come in. Patients who arrive via ambulance or life flight (as Reid and Nicholas did) come through the medic area, which is different. However, MVH also provides patients with pamphlets that contain the same information as the signs. Tamala Valentine, 11-12 and 39; Ex. YY. The sign that was posted in the emergency room area read: "Physicians that practice at Miami Valley Hospital are not employed by Miami Valley and may not be on your health insurance plan's provider list. You are responsible for payment of any physician services not paid by your health insurance plan. If you have

any questions regarding coverage, please contact your insurance company." Neither Kristin Garrett nor the Rupps recalled seeing this sign. Lisa Rupp would have been in the area where the sign was posted. L. Rupp at 33 and 38-39; K. Garrett at 95; and Reid at 29.

{¶ 68} However, Kristin Garrett and Lisa Rupp signed MVH consent and agreement forms during registration. Lisa also signed on Reid's behalf. Kristin did not review the form, and Lisa skimmed it. Valentine at 33; Bruce Podrat Deposition, 64; Reid at 30-31 and164; L. Rupp at 34-35; K. Garrett at 96-98; and Exs. WW and XX. These consent forms stated that:

> TREATING PHYSICIANS: I understand that the physicians who render professional services to me at Miami Valley Hospital may be independent practitioners and not employees or agents of the hospital. I agree that Miami Valley Hospital is not responsible for the acts or omissions of physicians that are not directed or controlled by Miami Valley Hospital, that these physicians' charges will be billed separately, and are in addition to the hospital's charges. I assign to these physicians any insurance and other benefits to which I am entitled for the services provided by them.

Ex. XXX and WW.

## 2. Discussion

{¶ 69} As noted, Plaintiffs contend that Premier violated the CSPA by failing to disclose material facts about Christman, including that he was not a Premier employee,

did not accept private insurance, was not in-network, engaged in balance-billing, and charged substantially higher rates than similarly situated physicians. Plaintiffs also argue that Premier wrongly failed to implement processes to ensure Christman complied with his contract after receiving "numerous" complaints. And finally, Plaintiffs rely on Premier's false representation to Kristian Garrett that Christman accepted insurance and would not be on the call schedule if he did not.

{¶ 70} In considering these arguments, we have extensively reviewed the record as well as both Ohio and federal cases interpreting the CSPA. While both Plaintiffs and Premier have submitted cases on general concepts involving the CSPA, what is missing is any authority involving situations like the case before us.

{¶ 71} "The Consumer Sales Practices Act, R.C. Chapter 1345, prohibits suppliers from committing either unfair or deceptive consumer sales practices or unconscionable acts or practices as catalogued in R.C. 1345.02 and 1345.03. In general, the CSPA defines 'unfair or deceptive consumer sales practices' as those that mislead consumers about the nature of the product they are receiving, while 'unconscionable acts or practices' relate to a supplier manipulating a consumer's understanding of the nature of the transaction at issue." *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 24. Generally, CSPA cases involve direct transactions between consumers and an entity performing services or selling a product. For example, in a case involving a dispute over installation of a heating system, the consumer alleged CSPA violations in that the heating company had agreed to a certain price but had later billed her for a much larger amount. *Classic Comfort Heating & Supply, LLC v. Miller*, 2022-Ohio-855, ¶ 10 (2d Dist.). *See*

*also State ex rel. Celebrezze v. Ferraro*, 63 Ohio App.3d 168 (2d Dist.) (illusory warranties for pest control violated the CSPA); *Whitaker v. M.T. Automotive, Inc.*, 2006-Ohio-5481 (CSPA violations by auto dealer in leasing truck).

**{¶ 72}** The few cases we found in which hospitals have been sued under the CSPA relate to alleged violations in collecting on hospital bills, overcharging for producing medical records, and the like. *See Thorton v. Meredia Suburban Hosp.*, 1991 WL 244206, *1 (8th Dist. Nov. 21, 1991) (collection); *Firelands Regional Med. Ctr. v. Jeavons*, 2008-Ohio-5031 (6th Dist.) (collection); *Deegan & McGarry v. Med-Cor*, 125 Ohio App.3d 449 (8th Dist. 1998) (overcharging for medical records; dismissed for lack of final appealable order); *Monroe v. Forum Health*, 2012-Ohio-6133 (11th Dist.) (hospital allegedly billed for tests it did not perform); *Viningre*, 140 Ohio App.3d 780, 785-786 (9th Dist.) (CSPA claim found viable where health system owned a clinic that had misdiagnosed a patient's PAP test. When the patient later needed a hysterectomy, the health system first agreed to pay for the surgery because of its negligence but then sued the patient for the surgery's cost.).

**{¶ 73}** Here, Premier did not sue Plaintiffs for bills generated by the hospital. Instead, the claim against Premier was that it failed to inform Plaintiffs about Christman's billing practices. However, we have rejected the theory that hospitals have a fiduciary or special relationship with patients or a duty to disclose or warn patients about an independent contractor's practices. *Eiford v. Burt*, 1994 WL 470319, *7 (2d Dist. Sept. 2, 1994); *see also Moore v. Burt*, 96 Ohio App.3d 520 (2d Dist. 1994).

**{¶ 74}** In *Moore*, a patient brought claims against a hospital for negligent retention,

negligent peer review, and fraudulent concealment. The claims arose from unorthodox surgery performed by a local surgeon and was one of many such cases that were filed. *Moore* at 522-524. Our decision primarily involved statute of limitations issues, but in the context of considering the dismissal of fraudulent concealment claims against the hospital, we stressed that "the representation alleged to constitute fraud was not made by 'employees or agents' of SEMC [the hospital]. It was made by Burt, an independent contractor with staff privileges at SEMC." *Id.* at 531. We remarked that "[a] hospital does have a duty to prevent improper surgery and injury to its patients. However, the remedy for a breach of this duty is limited to a negligent credentialing action against the hospital for retaining the incompetent physician." *Id.* at 532.

{¶ 75} The view we took in *Moore* is consistent with prevailing authority, which allows hospitals to be held liable for medical malpractice of doctors under an agency by estoppel (vicarious liability) theory and on an independent basis for negligent credentialing. *Browning v. Burt*, 66 Ohio St.3d 544, 556-558 (1993); *Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435, 444-445 (1994); *Comer v. Risko*, 2005-Ohio-4559, ¶ 28; *Walling v. Brenya*, 2022-Ohio-4265, ¶ 10 ("negligent-credentialing claim is independent, [but] . . . negligent-credentialing claims are not viable in the absence of medical negligence by the treating doctor"). In addition, hospitals have a fiduciary duty to patients to keep their medical information confidential. *E.g., Herman v. Kratche*, 2006-Ohio-5938, ¶ 20 (8th Dist.).

{¶ 76} None of the above situations exist here. There has been no assertion in this case that Christman was not a competent physician. The complaint is about

Christman's billing practices.

**{¶ 77}** In light of the above discussion, the trial court did not err in granting summary judgment on the CSPA claim against Premier, as it had no duty to inform Plaintiffs about the billing practices of an independent contractor. Furthermore, assuming for the sake of argument that Premier had such a duty, it did inform Plaintiffs, both by posting signs in the hospital and through the consent forms that Plaintiffs signed. In the consent forms, Plaintiffs acknowledged that physicians administering treatment may be independent contractors and that the physicians would separately bill for their services. While Plaintiffs stated they either did not read the consent form or merely skimmed it, they had the option to do so and chose to sign the document.

**{¶ 78}** According to Plaintiffs, Premier should nonetheless be held liable because it knew that Christman "immediately 'reverted' back to its prior unlawful billing practices" after the 2010 agreement was signed and failed to implement any procedure to alert patients that Christman did not accept insurance. Plaintiffs' Brief at p. 15. The initial part of this assertion, however, is taken out of context. As indicated, from 2007 until September 2012, Dianne Pleiman was vice-president of operations for MVH, and part of her responsibility was the MVH emergency trauma center. This included physician contracts. Pleiman took another position from September 2012 to April 2015, where she had no further involvement with physician contracts. In April 2015, Pleiman became chief operating officer at Upper Valley Medical Center, i.e., she was no longer at MVH. Pleiman at 12-13.

**{¶ 79}** During her deposition, Pleiman was questioned about an email she wrote

in response to a January 2018 email from Boosalis, in which Pleiman said: "It was an issue that had to be actively managed each week [Christman] was on call, as he routinely reverted to his practices that did not fulfill the agreement." *Id.* at 165. This email occurred after the 2016 events at issue here. Pleiman explained that when she wrote it, six years had passed since she was involved in physician contracts; she also was in another location (Upper Valley) and did not have access to her files at MVH hospital. *Id.* at 166.

**{¶ 80}** Pleiman further said it was not correct that Christman had to be actively managed because he kept reverting back to his prior practices. She then stressed (as has already been mentioned) that: "What I did actively managing him was, you know, I kept an eye on the call schedules, the plastics and max face call, and whenever Dr. Christman was going to be on call, I would just reach out, make a phone call to the office, you know, make sure everything was going okay, was there anything that they needed from us and just to make sure, as kind of a reminder, that we've got this new contract in place, and we want to make sure that we're keeping it up, and that's what I did up until, like, October of 2012, when I was responsible." *Id.* at 165.

**{¶ 81}** In this context, Pleiman also stated that while she was vice-president of operations, up to the end of September 2012, she did not observe any practices by Christman that would support her statement that he routinely reverted to his practices that did not fulfill the agreement. She believed her statement in the email was really related more to the time frame of when MVH was getting the complaints and Christman's practices were not changing. *Id.* at 166.

{¶ 82} In addition, Plaintiffs focus on a random statement that an unidentified MVH care person made to Kristin Garrett the day after Garrett's son was admitted to the hospital. Earlier that day, Garrett (who was a nurse at another hospital) called a co-worker who had worked in the surgery department of MVH and asked if she knew anything about the MVH physicians, including Christman. This co-worker told Garrett that Christman did not accept insurance but said she did not really know what that meant. K. Garrett at 25 and 52-53. Later that day, a MVH care manager came around and asked Garrett if she had any questions. Garrett asked the manager about Christman accepting insurance, and the manager stated that she believed that Christman would not be on call if he did not accept insurance. The manager did not tell Garrett that Christman was in-network and accepted her insurance. *Id.* at 53 and 57-58. Nonetheless, whether Christman accepted insurance or was in network was irrelevant, since Garrett's insurer paid for his services as if he had been in network, and Christman accepted the payment. *Id.* at 59, 66, and 122.

{¶ 83} Again, none of this is relevant, as Premier did not have a duty to inform Plaintiffs about Christman's billing. We also note that Plaintiffs did not check with their insurers to see if Christman was in-network until after their sons were released from the hospital. They also did not review their insurance policies or booklets, which clearly informed them that they would be responsible for the balance of services that insurance did not pay. *Id.* at 58, 80-83,120, 295-296 and Ex. 64; L. Rupp at 17, 19 48, 64-69, 181-184, 191, 229-235, and Ex. 43; R. Rupp at 226-233, 304, and Ex. 43. For reasons that will be discussed later, this does not impact the fraud claims against Christman.

{¶ 84} Based on the preceding discussion, the first assignment of error is overruled.

III.   Dismissal of Fraud Claims Against Christman

{¶ 85} Plaintiffs' second assignment of error states that:

The Trial Court Erred by Dismissing Rupp/Garretts's Claims for Fraud Against Christman.

{¶ 86} In the trial court, Plaintiffs asserted fraud claims against both Premier and Christman, and the court granted summary judgment to Defendants on these claims.   On appeal, Plaintiffs have not challenged the decision with respect to Premier.   However, they contend the court erred in granting summary judgment to Christman because they established at least genuine issues of material fact about whether Christman committed fraud.

{¶ 87} The elements of fraud are: "(1) a representation (or concealment of a fact when there is a duty to disclose) (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to mislead another into relying upon it, (5) justifiable reliance, and (6) resulting injury proximately caused by the reliance."   *Volbers-Klarich v. Middletown Mgt., Inc.*, 2010-Ohio-2057, ¶ 27, citing *Burr v. Stark Cty. Bd. of Commrs.*, 23 Ohio St.3d 69, 73 (1986).   " 'An action for fraud may be grounded upon failure to fully disclose facts of a material nature where there exists a duty to speak.' "   *Lone Star Equities, Inc. v. Dimitrouleas*, 2015-Ohio-2294, ¶ 61

(2d Dist.), quoting *Layman v. Binns*, 35 Ohio St.3d 176, 178 (1988). "Intent to mislead can be inferred or presumed depending on the facts and circumstances of the case." *Bundy v. Harrison*, 2002 WL 506423 (2d Dist. Apr. 5, 2002), citing *Jenkins v. Clark*, 7 Ohio App.3d 93, 101 (2d Dist. 1982).

**{¶ 88}** In the second amended complaint, Plaintiffs made the following allegations of fraud:

96. The Individual Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 95 of the Complaint as if fully set forth herein.

97. As part of his normal business practices, Dr. Christman engaged in systemic fraudulent and unlawful "upcoding" and/or "unbundling" of services on the invoices he sent to Plaintiffs, putative Class Members, and their insurers. Despite knowledge of these fraudulent and unlawful practices, neither Premier nor Christman disclosed these practices to the Plaintiffs, putative Class Members, and their insurers, and Defendants have continued or allowed to continue these unlawful practices despite repeated complaints from patients over the course of many years. Defendants also made statements to Individual Plaintiffs and putative Class Members that Premier accepted health insurance as an in-network provider. Defendants failed to disclose the fact Dr. Christman (i) was not an in-network provider, (ii) did not accept any insurance, and (iii) engaged in the practice of "balance billing" and systemic fraudulent and unlawful "upcoding" and/or

"unbundling" of services on invoices presented to Plaintiffs and putative Class Members. Defendants had a duty to disclose this information because it was necessary to prevent Defendants' representations of accepting health insurance and being an in-network provider from being false.

98. The Defendants knew the false and misleading nature of their conduct, statements, and omissions.

99. Defendants made false representations and concealments of material facts to Individual Plaintiffs and putative Class Members for monetary gain. The false representations or concealments by Defendants were material and were made with the intent to mislead and defraud Individual Plaintiffs and putative Class Members. Dr. Christman also engaged in fraudulent and unlawful conduct by systemically "upcoding" and/or "unbundling" of services on invoices presented to Plaintiffs and putative Class Members.

100. Defendants intended or expected Individual Plaintiffs and putative Class Members to rely upon the false representations or concealments and fraudulent conduct resulting in Individual Plaintiffs and putative Class Members receiving medical bills they otherwise would not have received from Dr. Christman.

101. Individual Plaintiffs and putative Class Members had the right to rely on and did rely on the false statements and omissions of Defendants.

102. Defendants knew the false and misleading nature of their conduct, statements, and omissions, as evidenced the numerous complaints and grievances filed by consumers over the period of years with Defendants and the state of Ohio regarding Defendants' billing practices and procedures.

103. Defendants' complete and utter indifference of its obligations under Ohio law reveals a conscious disregard of the rights of Individual Plaintiffs and putative Class Members, and the injuries suffered by Individual Plaintiffs and putative Class Members are attended by circumstances of fraud, malice, and willful and wanton misconduct, calling for an assessment of punitive damages against Defendants.

104. As a direct, proximate, and foreseeable result of Defendants' fraudulent conduct, Individual Plaintiffs and putative Class Members suffered damages in an amount to be determined by the Court, including punitive damages, attorney's fees, and costs.

Second Amended Complaint ("SAC") (Feb. 7, 2020), p. 27-28.

**{¶ 89}** " ' "Upcoding," a common form of Medicare fraud, is the practice of billing Medicare for medical services or equipment designated under a code that is more expensive than what a patient actually needed or was provided.' " *U.S. ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493, 498, fn. 2 (6th Cir. 2007), quoting *U.S. ex rel. Bledsoe v. Community Health Sys., Inc.*, 342 F.3d 634, 638, fn. 3 (6th Cir. 2003). (Other citation omitted.) " ' "Unbundling' occurs when a health provider, who initially

issues a service as one package, breaks down the service into component parts and finds individual reimbursement codes for those components, so long as the individual rates combined exceed the global rate.' " *Id.* at fn. 4, quoting *Bledsoe I* at fn. 4.

**{¶ 90}** The trial court's discussion of the fraud claims is sparse, but in granting summary judgment in Premier's favor, the court first found that "[t]he billing practices are ancillary to the medical care and treatment that forms the essence of the relationship between a hospital and a patient," and that "[t]he insurance coverage for patients in the United States is not part of the special relationship between medical provider and patient." SJ Decision at p. 5. The court therefore found that "the common law doctrine of special relationships that imposes a duty to disclose is not applicable to the insurance coverage of treatment provided by an on-call surgeon, like Dr. Christman, even though his actual treatment occurs in a hospital owned or operated by Premier." *Id.*

**{¶ 91}** Concerning Christman, the court simply stated that:

Furthermore, there is no genuine issue of material fact in dispute that neither Dr. Christman nor Premier were intending to mislead the plaintiffs and induce them to rely on Premier's acceptance of health insurance and by not disclosing that Dr. Christman's services were not so covered. Moreover, since plaintiffs did not pay Christman's bills that they allege constitute an essential element of their claims, there is no injury in fact demonstrated on the record before the Court.

SJ Decision at p. 6.

**{¶ 92}** We have already noted that the trial court's conclusion about lack of injury

was incorrect. When the summary judgment decision was rendered, Plaintiffs were still potentially liable to pay Christman's bills due to his pending counterclaims. Moreover, while Plaintiffs ultimately prevailed at trial against Christman on the counterclaims, the trial court would not have been aware of that when it rendered summary judgment. Plaintiffs could also still be potentially liable if they lose on appeal. Furthermore, in addition to charging interest on the unpaid amounts, Christman claimed he was owed attorney fees. Christman at 605-607.

{¶ 93} With that in mind, this case presents some unique characteristics due to the sequence of events. Christman rendered his services (at least the ones that made up the vast amount of his bills) in the hospital, before any contracts were signed. The alleged fraud would have taken place at that point, due to Christman's failure to disclose facts that Plaintiffs deem material. Specifically, by the time Plaintiffs were released from the hospital, Christman had already rendered services and could, therefore, choose to bill whatever he wished.

{¶ 94} Subsequently, when Plaintiffs came to Christman's office for follow-up treatment after being released from the hospital, they were presented with and signed contracts. Among other things, the contracts said in the first paragraph that: "Your insurance policy is a contract between you and your insurance company. We are not a party to this contract." The second paragraph said: "Our fees are generally considered to fall within the acceptable range of fees in this region and are considered to be 'usual, customary, or reasonable' by most companies." Under the third full paragraph, the contacts also said, "You will be billed the balance not paid by your insurance." And

finally, the bottom paragraph, just above the parties' signatures, stated: "I understand that I am responsible for payment of any services not covered by insurance." *See* Christman at 326-329, 584-585, and 607-608; Reid at 52-53, 165-166, and 172; L. Rupp at 47-48 and 220-221; Ex. 4 (the form signed by Lisa and Reid); and Ex. 75 (the form signed by Dennis Garrett).

{¶ 95} There was no evidence that Christman discussed his billing practices or obligations under his MVH contract before these contracts were signed. There was also a potentially fraudulent representation in the contracts that his fees were generally considered acceptable in the region and were reasonable and customary. This is a matter about which there is genuine and material dispute, as illustrated by the testimony of Plaintiffs' billing expert. *See* Rebecca Reier Deposition, 11, 103-104, 131-133, 137-138, 197, 200-201, 307-308, 474, 503, 522-529, 537, 546-553, 572-573, 585, and 590 (noting that Christman's fees were in the 90th percentile and were significantly above the reasonable and customary charges in the region, which were in the 75th percentile, meaning, respectively, that 90% or 75% of providers charged a specific amount or less for a particular service). Reier also said she had never seen payment of a 90th percentile-billed charge and that Christman had significantly overbilled Plaintiffs for his services, i.e., his fees were excessive. The highest payments Reier had ever seen were at the 50th to 60th percentile and were for special payors and under certain circumstances. As an example, a reasonable and customary charge for Reid's treatment at the 75th percentile would have been $8,087.49 rather than the amount Christman charged (more than $17,000). Finally, Reier stated that Christman had engaged in

upcoding and unbundling, which were outside American Medical Association and industry standards and were inappropriate. *Id.* at 36-38, 137-138, 244, 248-253, 265, 270, 276, 280, 286-288, 352-353, 401, 407-409, 442, and 585; Ex. 149, Appendix D.

**{¶ 96}** Regarding the trial court's discussion of the limits of the special relationship between medical providers and patients, we note that "[t]he physician-patient relationship arises out of an express or implied contract which imposes on the physician an obligation to utilize the requisite degree of care and skill during the course of the relationship." *Tracy v. Merrell Dow Pharmaceuticals, Inc.*, 58 Ohio St.3d 147, 150 (1991), citing *Amer v. Akron City Hosp.*, 47 Ohio St.2d 85 (1976). "The relationship is a consensual one and is created when the physician performs professional services which another person accepts for the purpose of medical treatment. . . . The physician-patient relationship is a fiduciary one based on trust and confidence and obligating the physician to exercise good faith. . . . As a part of this relationship, both parties envision that the patient will rely on the judgment and expertise of the physician. The relationship is predicated on the proposition that the patient seeks out and obtains the physician's services because the physician possesses special knowledge and skill in diagnosing and treating diseases and injuries which the patient lacks." (Citations omitted.) *Id.*

**{¶ 97}** Based on that relationship, for example, "[a] physician has a duty to disclose to a patient known material facts about the patient's medical condition." *Prysock v. Bahner*, 2004-Ohio-3381, ¶ 8 (10th Dist.), citing *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 56, fn. 1 (1987). From this standpoint, we agree that the fiduciary relationship may be confined to medical matters. However, that is not the end of the

analysis. Under the circumstances of this case, the relationship of confidence and trust between Christman and his patients overlapped to some extent with his contractual obligations. It was not strictly a business relationship. In fact, Christman acknowledged that he had such a responsibility to patients, stating that:

> . . . I owe my patients responsibilities, based on what I do, my code of ethics, the AMA code of ethics.
>
> I owe them the responsibility to not only care for their medical condition, but their financial condition as well, but my contract with Premier is one where I am still supposed to help my patients with their -- not only the medical conditions, but their financial condition.
>
> So it's not as if I am dissolved from any responsibility toward my patients.

Christman at 164.

**{¶ 98}** Nonetheless, even if one assumes the billing practices were just a business matter, parties dealing with each other in this situation can still owe a duty of disclosure. "Ordinarily in business transactions where parties deal at arm's length, each party is presumed to have the opportunity to ascertain relevant facts available to others similarly situated and, therefore, neither party has a duty to disclose material information to the other." *Blon v. Bank One, Akron, N.A.*, 35 Ohio St.3d 98, 101 (1988). In certain instances, however, there is a duty to speak. Such situations can include: where a party is in a fiduciary relationship; if an informal relationship exists where the parties "understand a special trust or confidence has been reposed"; or " 'where such disclosure

is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts.' " *Id.*, quoting *Umbaugh Pole Bldg. Co. v. Scott*, 58 Ohio St.2d 282 (1979), paragraph one of the syllabus, quoting *Connelly v. Balkwill*, 174 F.Supp. 49, 58 (N.D.Ohio 1959), and citing 2 Restatement of the Law 2d, Torts, § 551 and 529 (1977).   (Other citations omitted.)

{¶ 99} Section 551, cited in *Blon*, states that:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or

believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

**{¶ 100}** Subsection (1), (2)(a), or (2)(e) could apply here. Given the contract that Christman and Premier had entered into and that was still in effect, plus the background of the need for that contract, Christman would have been aware of how his billing practices adversely affected patients. He was also *contractually obligated* to disclose his billing practices to patients as soon as possible, which would allow patients to decide if they wanted to continue care with him. This was a duty, and Christman chose not to comply in treating Reid and Nicholas. During his deposition, the reason Christman offered repeatedly was that EMTALA prohibited him from making any disclosures to the Rupps or Garretts (or, indeed, to any patient he saw in the emergency room). Christman at 60-67, 70-74, 88-89, 147-149, 166-167, and 414-415.

**{¶ 101}** As noted, EMTALA was enacted to prevent the practice of hospitals dumping patients who could not afford care. When Christman was asked what EMTALA prohibited, he stated that: "If a patient has an emergency medical condition, discussion of financial issues are not proper until the patient has been stabilized, which by EMTALA

law and EMTALA definitions, EMTALA law means treatment." *Id.* at 62. As a result, most of the time disclosure of billing his practices occurred in Christman's office, when patients came for follow-up treatment after their operations. *Id.* at 88. On several occasions, Christman equated "stabilization" under EMTALA with treatment of the medical condition. *E.g., id.* at 70-71. He differentiated that from the hospital's EMTALA obligation, which generally ends on a patient's admission to the hospital. *Id.* However, Christman's explanation was inconsistent with EMTALA's language.

{¶ 102} Under 42 U.S.C.1395dd(e) and as relevant here, an "emergency medical condition" is defined as: "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in -- (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part. . . ." 42 U.S.C.1395dd(e)(1)(A). "Stabilized" is defined to mean "with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility. . . ." *Id.* at (e)(3)(A).

{¶ 103} "EMTALA's definition of 'stability' does not share the same meaning as the medical term 'stable condition,' which 'indicates that a patient's disease process has not changed precipitously or significantly.' " *St. Anthony Hosp. v. U.S. Dept. of Health & Human Servs.*, 309 F.3d 680, 694 (10th Cir. 2002), quoting *Tabor's Cyclopedic Med. Dictionary* (17th Ed. 1993). "Under EMTALA, '[a] patient may be in a critical condition

. . . and still be "stabilized" under the terms of the Act.' " *Id.*, quoting *Brooker v. Desert Hosp. Corp.*, 947 F.2d 412, 415 (9th Cir.1991). Thus, contrary to Christman's assertion, stabilization does not require that treatment on a patient be completed.

{¶ 104} Furthermore, based on the statute's wording, federal courts have held that " 'the stabilization requirement *only* sets forth standards for transferring a patient in either a stabilized or unstabilized condition. By its own terms, the statute does not set forth guidelines for the care and treatment of patients who are not transferred.' " (Emphasis in original.) *Williams v. Dimensions Health Corp.*, 952 F.3d 531, 535 (4th Cir. 2020), quoting *Harry v. Marchant*, 291 F.3d 767, 771 (11th Cir. 2002). *See also Alvarez-Torres v. Ryder Mem. Hosp., Inc.*, 582 F.3d 47, 52 (1st Cir. 2009) (agreeing with *Harry*), and *Bryan*, 95 F.3d 349.

{¶ 105} In *Williams*, the court noted that "[s]ubsequent regulations from the Centers for Medicare & Medicaid Services (the 'CMS') confirm the limited scope of the stabilization requirement. A 2003 final rule from the CMS adopted the approach of *Bryan* and the approach of other circuits, including *Harry*, providing 'should a hospital determine that it would be better to admit the individual as an inpatient, such a decision would not result in a transfer or a discharge, and, consequently, the hospital would not have an obligation to stabilize under EMTALA.' " (Footnote omitted.) *Williams* at 535-536, referring to CMS Final Rule, 68 F.R. 53222-01, 2003 WL 22074670, at *53244 (Sept. 9, 2003).

{¶ 106} The rule is codified as 42 C.F.R. 489.24, and states in subsection (d)(2)(i) that: "If a hospital has screened an individual under paragraph (a) of this section and

found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual." This "confirmed that a hospital's admission of a patient for treatments effectively acts as a defense to an EMTALA claim. But the CMS also articulated what might be described as a defense to the defense – the requirement that the admission be in good faith." *Williams* at 536. Consequently, "a hospital cannot admit an individual solely to evade liability under EMTALA." *Id*.

**{¶ 107}** Notably, the Sixth Circuit Court of Appeals "appears to stand alone" in interpreting EMTALA as imposing a duty on hospitals to stabilize an emergency condition and holding that the duty can extend to impatient care. *Thornhill v. Jackson Parish Hosp.*, 184 F.Supp.3d 392, 400 (W.D. La. 2016), discussing *Moses*, 561 F.3d 573 (6th Cir.). Consistent with the CMS regulation, MVH's EMTALA policy in effect at the time of the events in question in this case contained a good faith requirement. *See* Valentine at 41-46 and Ex. ZZ, Premier Bates 1481, Section 10.

**{¶ 108}** As noted, Christman also maintained repeatedly that EMTALA prohibited him from disclosing his billing practices. This apparently was a reference to 42 U.S.C.1395dd(h), which states that:

> A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) or further medical examination and treatment required under subsection (b) in order to inquire about the individual's method of payment or insurance status.

{¶ 109} As a preliminary point, this subsection refers only to participating hospitals, not to physicians. Second, the statute refers to *inquiry* about payment or insurance status, which is not the same as *disclosure* of billing practices. Christman did not have to ask patients about their payment method or insurance in order to inform them of his billing practices or that he did not contract with any insurance providers.

{¶ 110} In addition, a white paper (or authoritative report) prepared by the American Society of Plastic Surgeons ("ASPS") contains a position statement on EMTALA and EMTALA compliance by plastic surgeons. Podrat Deposition, 61-62 and Ex. III, p. 4, Issue 6. The ASPS is a national organization of plastic surgeons, and Christman was a member for many years during the 1980s, 1990s, and maybe the early 2000s, when he had a dispute over its organization. Christman at 495-498.

{¶ 111} The ASPS's position is that "surgeons who care for patients in the ER who are out of network are obligated to disclose this fact and explain the process of out-of-network billing to the patient. In fact, it is very important to ASPS plastic surgeons to ensure that patients generally understand the nature of the billing procedures for emergency consultation in the room." Ex. III at p. 6. *Id.* Dr. Belcastro, MVH's chief of staff and chief medical officer, agreed with this statement. Belcastro at 65. Hensley, who was in charge of doctor contracts at the time, also stated that even without the contract that was in place, Christman had a responsibility to disclose his billing practices to patients and that EMTALA did not prohibit doctors from disclosing to patients what insurance they were covered by or were in network with. Hensley at 37-39 and 158-159.

{¶ 112} Podrat, Premier's expert, had an MBA and a master's degree in hospital

and health services management and had worked exclusively in the health care industry as a hospital administrator, executive, and consultant for more than 20 years. Podrat at 6-7. According to Podrat, the hospitals with which he worked require that when physicians see patients in the emergency room, they must let patients know they will not take their insurance. *Id.* at 116.

{¶ 113} Even if all this were otherwise, Christman's own actions in the current case belie his claim that he could not make the required disclosures before treating these patients. As noted, Reid arrived at MVH in the early evening of December 6 and did not even see Christman until around 11:30 p.m. The surgery itself was performed in the early morning hours of December 7. The reason Christman gave both Reid and his parents for doing the surgery at that time was not that Reid was unstable and surgery could not wait; it was because Christman was booked with patients for the following day and preferred to do the surgery then, even though it was in the middle of the night. Reid at 35-36 and 265-267; L. Rupp at 42-43.

{¶ 114} Nicholas arrived at MVH by CareFlight and was admitted as a patient around 7:30 p.m. on October 26. Christman saw Nicholas and his parents late that evening briefly and discussed his care plan. However, the surgery was not performed until October 28. Clearly, there was ample time for Christman to disclose his billing practices. And, since surgery took place days later, there is no indication that such an explanation would have caused delay in treatment. Christman, in fact, did not offer this as a reason. Instead, his categorical stance was that EMTALA prohibited him from discussing these matters until after he had treated a patient.

{¶ 115} Finally, we note that Christman appears to have falsely represented to his collection agency in the context of the Rupp case that while he would like to discuss his fees with patients as well as the fact that he is not in network, all the hospitals he worked with had "blocked/prevented" him from doing this. Not only is there no evidence in the record to support this statement, MVH's witnesses specifically said Christman's claim was untrue. *See* Christman at 384-385; Ex. UUU (also labeled in other depositions as Ex. KK); Pleiman at 182-183; Belcastro at 68-69; and Hensley at 111-112.

{¶ 116} In light of the above discussion, there were genuine issues of material fact concerning whether Christman had recklessly concealed facts that were material to the transaction at hand with intent to mislead others into relying on his non-disclosure. The disclosures were clearly material to any prospective patients. If they were not, MVH would not have taken the serious step of canceling Christman's call contracts, removing him from the call schedule, and inserting disclosure requirements in his new contracts. In addition, Plaintiffs indicated that they would have sought a different in-network doctor had they known of Christman's billing practices. Reid at 39, 378-379 and 401; L. Rupp at 45-46; K. Garrett at 154 and 162; and D. Garrett at 61.

{¶ 117} Another element is whether Plaintiffs' reliance was justifiable. " 'The question of justifiable reliance is one of fact and requires an inquiry into the relationship between the parties.' " *Amerifirst Savs. Bank of Xenia v. Krug*, 136 Ohio App.3d 468, 495 (2d Dist. 1999), quoting *Crown Property Dev., Inc. v. Omega Oil Co.*, 113 Ohio App.3d 647, 657 (12th Dist. 1996). "Reliance is justifiable if the representation does not appear unreasonable on its face and if there is no apparent reason to doubt the veracity

of the representation under the circumstances." *Id.*, citing *Lepera v. Fuson*, 83 Ohio App.3d 17, 26 (1st Dist. 1992).

**{¶ 118}** In *Amerifirst*, we stressed the difference between "justifiable reliance" and "reasonable reliance," noting that: " ' "Although the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of the reasonable man.   Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." ' "   *Id.* at 88, quoting *Field v. Mans*, 516 U.S. 59, 71 (1995), quoting Restatement of the Law, Torts, § 545A, Comment b (1976).

**{¶ 119}** The trial court did not consider this issue because it rejected the fraud claim on another basis.   It is true that Plaintiffs did not ask Christman about his billing practices, nor did they consult their insurers to see if he was in network.   However, it is questionable whether knowledge of the network status would have mattered, since both insurers paid as if Christman were in network due to the emergency situations. Furthermore, Christman did not have a contractual relationship with any insurers that would have required him, as an in-network provider, to accept only the amount they paid. The issues, therefore, were the balance billing in which Christman engaged and the fact that his fees were excessive.   Since Christman failed to disclose balance billing, it would be hard to conclude that Plaintiffs failed to justifiably rely on anything – the crux of the matter is that Christman was silent about matters that he had a duty to disclose. Moreover, while the parties' insurance policies and booklets described balance billing, the

representation (or failure to disclose) in question was not that of an insurer; the party involved was a doctor, whom the parties had no reason to either distrust or question. Reid at 81, 228, and 230-233; L. Rupp at 64-67 and 230-234; K. Garrett at 208-209; and Reier at 32-33 and 35-36.

{¶ 120} As a final point, Christman falsely represented that his fees were reasonable and customary (or at least there is a material issue of fact on this matter), and Plaintiffs would have had no ability to discover whether this was true. Instead, they relied on this statement when they agreed to pay. Reid at 165 and 169-171; L. Rupp at 175-176, 192, 209-210, 222, 242, and 248; K. Garrett, 117, 154, and 196-197; and D. Garrett at 61-62.

{¶ 121} The last element of fraud refers to damages. Specifically, a party's fraudulent acts must cause a resulting injury. *Volbers-Klarich*, 2010-Ohio-2057, at ¶ 27. " 'A party who has been fraudulently induced to enter into a contract has the option of rescinding the contract or seeking damages based upon the tort of fraudulent inducement.' " *Ajibola v. Ohio Med. Career College, Ltd.*, 2018-Ohio-4449, ¶ 26 (2d Dist.), quoting *Simon Property Group, LP v. Kill*, 2010-Ohio-1492, ¶ 30 (3d Dist.). "The measure of damages for fraudulent inducement would be 'the actual natural losses flowing from the fraud.' " *Id.*, quoting *Curt Collins Co., Inc. v. Dudich*, 1976 WL 188882, *4 (9th Dist. Aug. 18, 1976). Our court has also "recognized that a plaintiff's out-of-pocket losses incurred due to the parties' contract may be the appropriate measure of damages for a claim of fraudulent inducement." *Id.* at ¶ 27.

{¶ 122} Given that Plaintiffs had the option of rescinding the contracts they had

signed with Christman, the trial court's summary judgment precluded them from exercising this option. The fact that they later prevailed on Christman's counterclaims does not change this fact, which was unknown when summary judgment was rendered. A case cited by Plaintiffs is instructive on this point. In *Lazzaro v. Picardini*, 1992 WL 25283 (11th Dist. Jan 24, 1992), a property owner filed a forcible entry and detainer complaint against a receiver of a restaurant, seeking recovery of unpaid taxes, rent and insurance. The receiver counterclaimed on various grounds, including breach of fiduciary duty in inducing transfer of the real estate for inadequate consideration and fraud. *Id.* at *1. At trial, the receiver admitted the owner's claim for eviction and unpaid rent but argued the owner's fraud precluded recovery. The jury then found in the receiver's favor on the owner's claims for eviction and back rent and on the fraud counterclaim. However, the jury did not award the receiver any damages. *Id.* at *2.

{¶ 123} On appeal, the receiver argued the verdict was inconsistent because the jury did not award any damages. However, the court of appeals rejected the argument because the receiver had failed to object properly in the trial court. *Id.* at 3-4. In addition, the court noted that:

> The jury's failure to award Picardini [the receiver] damages does not necessarily mean that the jury did not find injury resulting from Lazzaro's fraud. In fact, as Picardini argues, the fraudulent actions of Lazzaro caused Andy's Cabin, Inc. to enter into the unconscionable lease and incur over $95,000 in back rent. After granting judgment in favor of Picardini on Lazzaro's claim, *and essentially canceling the rent debt*, *the jury had no*

*need to award Picardini additional damages.* Therefore, the lack of a damage would not be inconsistent with the verdict in favor of Picardini on both Lazzaro's complaint and Picardini's counterclaim for fraud.

*Id.* at *4.

{¶ 124} The same reasoning applies here.  As indicated, one of the remedies for fraudulent inducement is recission of a contract.  If Plaintiffs were allowed to establish that claim here, they would not be liable to pay Christman anything.  Again, while Plaintiffs eventually prevailed on Christman' counterclaims, that was not known at the time of summary judgment, and the trial court failed to consider any of these points in ruling on summary judgment.

{¶ 125} Furthermore, in responding to summary judgment, Plaintiffs asserted that they had suffered damages as a result of Christman's debt collection actions; they also claimed emotional distress, loss of time, costs for travel, and other costs.   Plaintiffs' August 28, 2020 Response to Premier Motion for Summary Judgment, p. 28-29.

{¶ 126} "It has long been the rule in our state that '[a] person injured by fraud is entitled to such damages as will fairly compensate him for the wrong suffered; that is, the damages sustained by reason of the fraud or deceit, and which have naturally and proximately resulted therefrom.' "  *Burr v. Bd. of Cty. Commrs. of Stark Cnty.*, 23 Ohio St.3d 69, 74 (1986), quoting *Foust v. Valleybrook Realty Co.,* 4 Ohio App.3d 164,166 (6th Dist. 1981).   Compensatory damages include mental anguish, but "[i]n the absence of a contemporaneous physical injury, damages attributable to mental distress are usually recoverable only if the wrongdoer's act is a malicious or outrageous invasion of a personal

right." *Columbus Fin., Inc. v. Howard*, 42 Ohio St.2d 178, 185 (1975).

**{¶ 127}** Here, Plaintiffs testified about elements of compensatory damages other than the amount at issue, including mental anguish. They also alleged malice on Christman's part. *See* Reid at 14 and 124 (who was employed in Cleveland but traveled to be deposed in Dayton), 184-189 and 194 (invoices for lawyer fees were paid); 192, 193, and 195 (loss of sleep and stress); 190, 192, 196-197, and 204-210 (time spent reviewing documents, doing appeals, and meeting with lawyers); L. Rupp at 129; K. Garett at 137 and 224 (stress and Christman's threat to sue and turn the Garretts' bill over to collection); Reier at 239 and 241 (billing invoices of $962 each for Rupps and Garrett expert review).

**{¶ 128}** The trial court did not consider any of these matters but based its decision on the fact that Plaintiffs had not incurred any damages because they had not paid Christman's bill. As noted, that was incorrect. The court also did not address the claims for punitive damages and attorney fees, which are recoverable in fraud actions. "Since the earliest cases at common law, juries in Ohio have been permitted to include reasonable attorney fees as part of compensatory damages when the jury also awards exemplary or punitive damages. . . . '[I]n cases where the act complained of is tainted by fraud, or involves an ingredient of malice, or insult, the jury, which has power to punish, has necessarily the right to include the consideration of proper and reasonable counsel fees in their estimate of damages.' " *Cruz v. English Nanny & Governess School*, 2022-Ohio-3586, ¶ 37, quoting *Roberts v. Mason*, 10 Ohio St. 277, 282 (1859). (Other citations omitted.)

{¶ 129} "Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."  *Preston v. Murty*, 32 Ohio St.3d 334 (1987), syllabus.  "This is not a conjunctive requirement; the disregard can be for either rights or safety."  *Crawford v. Am. Family Ins. Co.*, 2024-Ohio-5345, ¶ 54 (2d Dist.), citing *Chapel v. Wheeler Growth Co.*, 2023-Ohio-3988, ¶ 12 (1st Dist.) (which had discussed *Preston's* own clarification of this point at page 336 of its decision).  "Actual malice is necessary for an award of punitive damages, but actual malice is not limited to cases where the defendant can be shown to have had an 'evil mind.' "  *Cabe v. Lunich*, 70 Ohio St.3d 598, 601 (1994).  Further, "actual malice may be inferred from conduct and surrounding circumstances."  *Howard*, 42 Ohio St.2d at 184.

{¶ 130} Based on our review of the record, and for the reasons previously stated, there are also genuine issues of material fact concerning whether Christman acted in conscious disregard of Plaintiffs' rights, and, therefore, acted with actual malice. Consequently, the trial court erred in dismissing Plaintiffs' fraud claim against Christman.

{¶ 131} In light of the preceding discussion, the second assignment of error is sustained.

IV.   Third Party Beneficiary Claims

{¶ 132} Plaintiffs' final assignment of error states that:

The Trial Court Erred By Dismissing Rapp/Garretts's Claims for

Intended Third-Party Beneficiary Breach of Contract.

{¶ 133} Under this assignment of error, Plaintiffs contend that the trial court erred in dismissing their claim that they were entitled to sue Christman for breach of contract because they were third-party beneficiaries of the contract between Christman and Premier.

{¶ 134} In the Second Amended Complaint, Plaintiffs alleged that they were intended third-party beneficiaries of the contract between Premier and Christman, and that Christman breached the contractual duties "by failing to disclose the following material facts: (i) he does not work as an employee of Premier, (ii) he worked as an independent contractor, (iii) he does not accept any insurance, (iv) he is not an "in-network" provider for any insurance, (v) he engages in "balance billing" practices, (vi) and he bills at rates substantially higher than what any similar situated physician would charge for the same services (which included unlawful and systemic 'upcoding' and/or 'unbundling' of services on invoices presented to Plaintiffs and putative Class Members)." SAC at p. 30.

{¶ 135} In granting summary judgment to Christman, the trial court stated that:

Plaintiffs assert that they are third-party beneficiaries to the independent contractor relationship between Premier and Christman. Plaintiffs have failed to present evidence that supports this claim, including that Christman breached the agreement with Premier in his dealing with plaintiffs. As Christman argues, the agreement was not involved in his emergency medical treatment provided to Rupp. Christman Mem., 25.

Further, they present no evidence that the agreement between Premier and Christman was intended to benefit them in their individual emergency room encounter with Christman.

SJ Decision at p. 7.

{¶ 136} As a preliminary point, the trial court incorrectly found that Christman's 2010 agreement with Premier was not involved in Christman's emergency room treatment of Reid. In arguing for summary judgment on this point, Christman claimed that: "Because he was not on call for maxillofacial trauma services, Dr. Christman's treatment of Reid was not rendered pursuant to the Agreement, i.e., he was not paid anything by MVH for being on call and the Agreement's other terms and conditions did not apply." Motion of Defendant Kenneth D. Christman, M.D. for Summary Judgment On Plaintiffs' Claims (Oct. 12, 2020), p. 7.

{¶ 137} This statement misconstrues the evidence. Specifically, while it is true that Christman was not on max face call the evening of December 6, 2016, Christman *was on call for plastic surgery that night* (when he was called by MVH), and on December 7 (the next day when he operated on Reid). *See* Christman at 136-137 and 525-529; and Plaintiff's Ex. HHHH attached as part of Ex. A to Christman's summary judgment motion (the December 2016 MVH call schedule). According to Christman (and the contract for plastics), Christman was paid $1,950 per week for being on-call for plastics and he was usually on plastics call for two weeks at a time. *Id.* at 344. Consequently, Christman would have been paid pursuant to that contract when he was called in to treat Reid, and the contract would have applied to Reid's situation. *See* Pleiman at 28 and 92

(on-call physicians are paid a flat fee whether they are called in or not, and all physicians are paid the same amount).

{¶ 138} As noted earlier, the max face and plastics contracts contained the same content, other than the payment amounts. *Id.* at 138; Christman at 302-303 and 347. The upshot is that Christman *was on call* when he came into MVH to consult with the Rupp family and he was bound to follow the terms he had agreed to in the 2010 contracts. The trial court, therefore, incorrectly found that Christman's contract was not involved in Reid's situation.

{¶ 139} In addition, the trial court erred in disregarding the fact that Christman was on max face call the night that he was called in to see Nicholas Garrett. *See* Christman at 165. Therefore, Christman's contract with Premier was involved in that transaction as well. Finally, the trial court based its conclusion that Christman had not breached his contract with Premier solely on the incorrect finding about Reid's surgery. However, even if the court had added additional reasons for finding no breach, that would have been incorrect as well. Based on our prior discussion, there are genuine issues of material fact concerning whether Christman breached his contract with Premier.

{¶ 140} We turn now to the issue of whether Plaintiffs could bring a claim against Christman based on his contract with Premier. "Only a party to a contract or an intended third-party beneficiary of a contract may bring an action on a contract in Ohio." *Grant Thornton v. Windsor House, Inc.*, 57 Ohio St.3d 158, 160 (1991), citing *Visintine & Co. v. New York, Chicago, & St. Louis RR. Co.* 169 Ohio St. 505 (1959). However, Ohio has also adopted "the statement of law with respect to intended and incidental beneficiaries

found in Restatement of the Law 2d, Contracts, § 302, 439-440 (1981)." *Hill v. Sonitrol of Southwestern Ohio, Inc.*, 36 Ohio St.3d 36, 40 (1988). In this regard, § 302 states as follows:

"(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

"(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

"(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

"(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary."

*Id.,* quoting § 302.

{¶ 141} The "intent to benefit" test is used to decide if third-parties to contracts are intended beneficiaries. Based on this analysis, " 'if the promisee . . . intends that a third party should benefit from the contract, then that third party is an "intended beneficiary" who has enforceable rights under the contract. If the promisee has no intent to benefit a third party, then any third-party beneficiary to the contract is merely an "incidental beneficiary," who has no enforceable rights under the contract. . . . '[T]he mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract [is] insufficient; rather, the performance of that promise must also satisfy a

duty owed by the promisee to the beneficiary.' " *Id.*, quoting *Norfolk & W. Co. v. United States,* 641 F.2d 1201, 1208 (6th Cir. 1980). "Nevertheless, there is no requirement that the contract explicitly identify the third party beneficiary." *Daley v. Fryer*, 2015-Ohio-930, ¶ 33 (3d Dist.), citing *First Fed. Bank v. Angelini*, 2007-Ohio-6153, ¶ 11 (3d Dist.).

**{¶ 142}** In considering intent, "[c]ourts generally presume that a contract's intent resides in the language the parties chose to use in the agreement." *Huff v. FirstEnergy Corp.*, 2011-Ohio-5083, ¶ 12, citing *Shifrin v. Forest City Ents., Inc.*, 64 Ohio St.3d 635, 638 (1992). " 'Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions.' " *Id.*, quoting *Shifrin* at the syllabus. "Ohio law thus requires that for a third party to be an intended beneficiary under a contract, there must be evidence that the contract was intended to directly benefit that third party. Generally, the parties' intention to benefit a third party will be found in the language of the agreement." *Id.*

**{¶ 143}** *Huff* involved a woman who had been injured when a tree limb fell during a heavy thunderstorm. The tree was close to but outside an easement that Ohio Edison maintained, and Edison had contracted with a tree service to inspect trees and vegetation along power lines and to remedy anything that might affect the lines. *Id.* at ¶ 2. Because the contract included a provision stating that " '[t]he Contractor shall plan and conduct the work to adequately safeguard all persons and property from injury,' " the plaintiff argued that it assigned a duty to both Edison and the tree service to protect the public for her benefit. *Id.* at ¶ 13. However, the Supreme Court of Ohio disagreed,

finding the contract was not designed to protect people walking on public roads. Instead, the contract was intended to support Edison's utilities through performance of vegetation and tree removal, and the pertinent part of the contract, which included protecting public safety, related to the contractor's actions while performing the work itself. In other words, given the hazards of working around electrical lines, the duty extended only until the contractor's work was finished. *Id.* at ¶ 18-19.

{¶ 144} In *Huff*, the contractor had last been in the area in 2001, and the plaintiff was injured more than three years later. Thus, the plaintiff was not an intended third-party beneficiary and could not sue the contractor on that basis. *Id.* at ¶ 2-3 and 20.

{¶ 145} Similarly, auto-body repair shops were only incidental beneficiaries to insurance contracts because the contracts' purpose was to provide coverage to insureds for vehicle damages, and no contractual language established any duty to the auto shops. *Blue Ash Auto Body, Inc. v. Progressive Cas. Ins. Co.*, 2011-Ohio-5785, ¶ 9 (1st Dist.).

{¶ 146} In contrast, a court found that a student transferring from a community college to a state college was an intended third-party beneficiary of an agreement between those two institutions because she was in a category of students described in the agreement. *Prince v. Kent State Univ.*, 2012-Ohio-1016 (10th Dist.). Specifically, an Articulation and Transfer Agreement between Cuyahoga Community College ("CCC") and Kent State University ("KSU") stated that "the parties entered into the agreement, in part, 'to better facilitate the transfer of students between' CCC and KSU." *Id.* at ¶ 23. The agreement further said that "students who transfer to KSU upon completion of an associate degree at CCC 'will be admitted to KSU at any of its campuses on a space

available basis' and 'will be granted junior level standing if a minimum of . . . 64 semester hours have been completed with a grade of C or better.' " *Id.* In addition, the agreement allowed " '[a]ll credits earned with a grade of C or better [to] be transferred to KSU.' " *Id.*

**{¶ 147}** In light of these contractual provisions, the court of appeals found that "KSU entered into the Articulation and Transfer Agreement with the intent to benefit students who transfer from CCC to KSU." As a result, the plaintiff, who fit within that category, was an intended third-party beneficiary and could bring a contract action against KSU for failing to comply with the agreement. *Id.*

**{¶ 148}** The situation here is much more like *Prince* than the other cases. Without even considering the underlying factual background, the contractual language, including Section 5, indicates a clear intent to benefit a specific group of individuals. First, the preamble to the contract states that:

> WHEREAS, Hospital, owns and operates an acute care hospital with a Level One trauma center and various ambulatory clinical and emergency room settings, including Miami Valley South Hospital, which provide care to the citizens of the community; and
>
> WHEREAS, Hospital does not operate a Plastic surgery clinic for trauma patients ("Plastic clinic"); and
>
> WHEREAS, the community has a need for a Plastic clinic to treat the large number of indigent and uninsured residents of the community in need of Plastic services; and
>
> WHEREAS, Hospital desires to provide Plastic services to the

community through a network of physicians and surgeons who are willing to take emergency room call for Hospital's facilities and provide inpatient consultations as well as follow-up care in their private offices; and

WHEREAS, Hospital and Physician believe that the Agreement will benefit the community by furthering the provision of quality care to all persons regardless of ability to pay. . . .

Ex. CC (PREMIER0000505).

{¶ 149} The contract then goes on to specifically reference Christman's patients, i.e., by stating in Section 5 that, "If Physician does not take patients['] third party insurance for the services provided under this Agreement, Physician agrees to the following." *Id.* at PREMIER0000507. This statement is followed by a list of obligations, including that Christman: disclose to patients "as soon as possible that he does not take private insurance as payment for his services under this Agreement"; charge "*said patients* amounts that are reasonable for his specialty in the area, taking into account the amount that patient would have had paid by third party insurance"; restrict collection attempts; and make "every reasonable effort to compromise any bill with patients receiving care under this Agreement." *Id.* Frankly, it would be difficult to find a more clear case of intended third-party beneficiaries.

{¶ 150} In his deposition, Christman claimed the reference in Section 5 to taking a patient's insurance was not well-worded, as his office does "take people's insurance and bill their insurance." Christman at 317-318. This is disingenuous, as the contract is not ambiguous with respect to what was intended. However, to the extent any ambiguity

could exist, the factual background we have discussed reveals that the contracting parties clearly were aware of what was meant. Furthermore, Christman went on to admit that while he was "not bound by the terms of any insurance contract for a self-insured employer or a third-party administrator," he understood that MVH wanted him to "work with patients and the insurers in these issues." *Id.* at 318.

**{¶ 151}** In one Ohio case, a doctor whose privileges were terminated by a hospital claimed he had a right as an intended third-party beneficiary to sue the hospital for breach of a contract that required the hospital to follow certain procedures in taking adverse actions against doctors. *See Long v. Mt. Carmel Health Sys.*, 2017-Ohio-5522 (10th Dist.). In that situation, the doctor was even specifically named as one of the doctors in the group that was a party to the contract, and he was listed as being currently approved to practice in the hospital. *Id.* at ¶ 2. While this indicates the doctor could have had the beneficiary status he claimed, the contract further said that: " 'No Third Party Beneficiaries. Nothing herein expressed or implied is intended or shall be construed to confer upon or give any person other than the parties hereto, and their permitted successors and assigns, any rights or remedies under or by reason of this Agreement.' " *Id.* at ¶ 18 (quoting contract between Mt. Carmel and anesthesia group). The court therefore found that the doctor had no rights as an intended beneficiary to sue under the contract. Notably, the contracts between Christman and MVH had no such provision.

**{¶ 152}** Accordingly, and for the reasons stated, the trial court erred in finding that Plaintiffs were not intended third-party beneficiaries of the contract between Premier and Christman, and in granting summary judgment on the contract claim against Christman.

The third assignment of error, therefore, is sustained.

## V.   Conclusion

**{¶ 153}** Plaintiffs' first assignment of error having been overruled, and the second and third assignments of error having been sustained, the summary judgment in favor of Premier is affirmed, and the summary judgment in favor of Christman is reversed.   This cause is remanded for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

EPLEY, P.J. and LEWIS, J., concur.