[Cite as *Hopper v. Landen Auto Mart, L.L.C.*, 2025-Ohio-2275.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| ANDREW J. HOPPER, | : | |
| Appellant, | : | CASE NO. CA2024-10-070 |
| | : | O P I N I O N |
| - vs - | | 6/30/2025 |
| | : | |
| LANDEN AUTO MART, LLC, | : | |
| Appellee. | : | |

CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 23CV96381

Shane Law Office, and Steven C. Shane, for appellant.

ALH Law Group, and Allison L. Harrison, for appellee.

**HENDRICKSON, P.J.**

{¶ 1} Appellant, Andrew J. Hopper, appeals from a decision of the Warren County Court of Common Pleas granting summary judgment to appellee, Landen Auto Mart, LLC ("LAM"), on Hopper's claims for civil fraud and violations of the Ohio Consumer Sales

Practices Act. For the reasons set forth below, we affirm the decision of the trial court.

## I. FACTS & PROCEDURAL HISTORY

{¶ 2}　LAM, a limited liability company located in Loveland, Warren County, Ohio, is a licensed seller of used motor vehicles. LAM is owned exclusively by Maher Odeh.[1] Hopper is a resident of Fort Worth, Texas. A dispute between the parties arose following Hopper's purchase of a used automobile, a 2017 BMW X5M, from LAM.

{¶ 3}　The BMW at issue had been purchased online by LAM on March 15, 2023 through Manheim Auto Auction. In April 2023, after receiving possession of the vehicle, LAM had it serviced at Bob Sumerel Tire & Service.

{¶ 4}　On May 15, 2023, Hopper, who had been searching online for a BMW X5 5.0 or M model, located the subject vehicle on the website cars.com. Hopper submitted a request for more information on the vehicle. He received an emailed response from LAM indicating that the vehicle was "still available" and "Freshly Serviced, Inspected and Ready to go." Hopper responded by requesting any "documentation such as Carfax, service/inspection records" and photographs of the undercarriage of the vehicle. The next day, Odeh, on behalf of LAM, sent a "walk around" video of the vehicle, pointing out a couple of small scratches but otherwise referencing the condition of the vehicle as "amazing" and in "great shape."

{¶ 5}　Hopper requested his own inspection of the vehicle and hired the Lemon Squad to conduct the inspection. The Lemon Squad issued a report, which stated there was an "aftermarket exhaust installed" on the vehicle, but the "vehicle appears to be in working order." The report further indicated the Lemon Squad inspector "hooked up [a]

---

1. Odeh was a named defendant in the action. However, on May 3, 2024, Hopper voluntarily dismissed Odeh from the lawsuit with prejudice. Odeh is not a party to the present appeal.

Scan Tool to the computer system and found no current or pending codes." On May 18, 2023, after reviewing the Lemon Squad's report, Hopper sent an email to LAM, which stated, in pertinent part, as follows:

> [T]hank you again for accommodating the virtual tour and test drive as well as the inspection. *There were a few things that came up on the inspection such as* the rim rash, dent/ding in the driver side door, paint chips/scratches, surface rust on the bottom and *a concern with the aftermarket exhaust passing Texas noise ordinance requirements. I will need to address those items should we come to terms on a deal.* In consideration of this I would like to offer a cash deal and would wire you $49,000 for the 2017 BMW X5M. I will need to pay registration fees and taxes in Texas upon delivery. I will also pay for and coordinate shipping to Fort Worth at my expense unless you have a shipping company referral to consider.

(Emphasis added.)

{¶ 6} The parties agreed on a negotiated purchase price of $49,486, and on May 19, 2023, Hopper signed a Bill of Sale for the vehicle. The Bill of Sale included an "as is" warranty disclaimer, advising Hopper as follows:

> **WARRANTY DISCLAIMER**
>
> **Unless Seller provides a written warranty, or enters into a service contract within 90 days from the date of this contract, this vehicle is being sold "AS IS – WITH ALL FAULTS" and Seller makes no warranties, express or implied, on the vehicle and there will be no implied warranties of merchantability or fitness for a particular purpose.** This disclaimer does not affect any warranties by the vehicle manufacturer. Seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle and related products and services.

(Underline and bold in original.)

- 3 -

{¶ 7} Hopper wired the funds for the vehicle to LAM and the vehicle was shipped by a third party to Hopper in Texas, with Hopper paying the shipping expenses. In order for the vehicle to be registered in the State of Texas, the vehicle was required to pass an air quality inspection. Hopper took the vehicle to a state-sponsored vehicle testing facility on June 6, 2023, where the vehicle failed to pass inspection. Hopper was provided with a set of driving protocols to follow and instructed to return in a few days to have the vehicle retested. On June 9, 2023, the vehicle again failed to pass inspection. Hopper had the vehicle inspected at Autobahn BMW Fort Worth. He was advised that the vehicle lacked catalytic converters and oxygen sensors and was equipped with non-BMW aftermarket software designed to conceal or disguise this information. Autobahn provided an estimate of nearly $23,000 to replace the missing emission control equipment and bring the vehicle up to code.

{¶ 8} Hopper informed LAM of the issues with the vehicle and provided it with the report from Autobahn. Hopper demanded a cancellation and recission of the sale along with a refund of his money. On July 18, 2023, through counsel, he sent a revocation of acceptance letter to LAM, but LAM refused to rescind the sale and return Hopper's money.

{¶ 9} Hopper filed suit, asserting claims for fraud and violations of the Ohio Consumer Sales Practices Act (CSPA). Specifically, Hopper alleged LAM had violated the CSPA by committing an unfair or deceptive act (R.C. 1345.02) or an unconscionable act (R.C. 1345.03) in connection with the sale of the BMW X5. LAM filed an answer denying Hopper's claims. Thereafter, the parties engaged in discovery. Hopper and Odeh, in his individual capacity and as a representative of LAM, were deposed and their depositions filed with the trial court. During his deposition, Odeh acknowledged that when LAM

purchased the BMW online through Manheim Auto Auction it had viewed a Condition Report on the car.[2] Odeh testified that LAM has some diagnostic equipment on its lot, specifically a Grade Elite 200 "snap-on machine," but this device was not used on the BMW as the vehicle's check engine light was not on. Odeh explained the vehicle was sent to Bob Sumerel Tire & Service for inspection and service.

{¶ 10} On March 14, 2024, LAM moved for summary judgment on Hopper's claims, arguing that Hopper could not prevail on his CSPA claims as LAM had not engaged in any unfair, deceptive, or unconscionable acts or practices in connection with the sale of the vehicle. LAM noted the vehicle had been sold "as is" and contended that its statements that the vehicle was "Freshly Serviced, Inspected and Ready to go" and was "amazing" were either true statements or permissible puffery. It further contended that it had not known that the vehicle lacked emission control equipment prior to selling the vehicle to Hopper. With respect to Hopper's fraud claim, LAM argued Hopper could not prove that LAM made any knowingly false statements or that it intended to mislead Hopper. LAM supported its motion for summary judgment with an affidavit from Odeh, the bill of sale for LAM's purchase of the vehicle from the auto auction, the bill of sale from

---

2. When Odeh was deposed, the following discussion occurred regarding the information LAM had on the BMW before deciding to purchase it at auction:

> [Hopper's Counsel]: Okay. Let's go back to my previous question. Other than to see a picture of the vehicle, and we're talking about the vehicle that's the subject of this case. Other than to – other than the picture you see of the vehicle, you're purchasing this vehicle sight unseen, right? You don't have it in your possession at the time you purchased it?

> [Odeh]: Absolutely not. I mean, they have a condition report on – the car. You know what I mean? Which is showing, like, if it have any damage, if it have any scratches, if it have any – and the CR, it was on, it's kind of – kind of a clean car for the – the year of the vehicle. And that's how we determine on the car. . . . But the car when we purchase it, it – I believe it have a good condition report on it, and that's how we bought it.

Hopper's purchase of the vehicle, service records for the vehicle from Bob Sumerel Tire & Service, the Lemon Squad's report on the vehicle, and various emails exchanged between LAM and Hopper regarding the results of the Lemon Squad's report and Hopper's offer to buy the vehicle.

{¶ 11} In his affidavit, Odeh stated, in pertinent part, the following:

> 6. Upon obtaining possession of the Vehicle, [LAM] had the Vehicle serviced by Bob Sumerel Tire & Service who is a mechanic that is regularly used to inspect and service vehicles for [LAM] to prepare them for sale. . . .
>
> 7. [LAM] was not informed of any issues with the Vehicle's emission control system.
>
> 8. [LAM] conducted an inspection and test drive of the Vehicle and did not have any cause to believe there were any issues with the Vehicle's emission control system.
>
> 9. Prior to the Sale of the Vehicle, [LAM] . . . did not have any knowledge or information regarding missing equipment in the Vehicle's emission control system.
>
> 10. [LAM] provided a full, open and fair opportunity for Mr. Hopper to inspect the Vehicle prior to the Sale.
>
> 11. Mr. Hopper hired a company called Lemon Squad who sent a representative to [the] dealership to inspect, photograph and test-drive the Vehicle. [LAM] does not have any connection to Lemon Squad and the representative was freely able to inspect, investigate, and photograph the Vehicle.

{¶ 12} Hopper filed a memorandum in opposition to summary judgment, arguing that genuine issues of fact existed on his fraud and CSPA claims. Hopper argued the "as is" clause in the bill of sale did not bar his claims and that LAM's statements about the vehicle being "Freshly Serviced, Inspected and Ready to go" and "amazing" were not

mere puffery. Rather, he argued they were untrue and deceptive statements about the condition and quality of the vehicle. He further argued LAM had constructive knowledge or was willfully ignorant of the fact that the vehicle lacked emission control equipment and that LAM's intent to defraud could be inferred from such constructive knowledge or its reckless disregard of the facts. Hopper supported his arguments with his own affidavit, the bill of sale from his purchase of the vehicle, the report and estimate he received from Autobahn BMW Fort Worth, his July 18, 2023 revocation of acceptance letter, LAM's responses to interrogatories and requests for admissions, the Lemon Squad's report on the vehicle, a Condition Report on the vehicle, and a report from Don Clark, an automotive expert.[3]

{¶ 13} In his affidavit, Hopper stated, in relevant part, the following:

> 3. [I]n connection with the sale of the subject vehicle . . . Odeh represented that it was an "amazing vehicle," in "great shape" and "freshly inspected and ready to go" that if he didn't own one already he would be buying the subject vehicle himself;
>
> 4. Affiant states further that he relied on these representations made by . . . Odeh in purchasing the vehicle;
>
> 5. Affiant states further that he relied on and believed that the subject vehicle was free and clear of any significant defects and that it was in great shape and fine operating condition as represented by . . . Odeh.

---

3. It is unclear from the record whether the Condition Report attached to Hopper's memorandum in opposition to summary judgment is the same Condition Report that LAM viewed prior to purchasing the BMW at auction. Hopper's expert, Don Clark, indicated in his April 5, 2024 addendum to his initial expert report that the Condition Report had not been in the possession of Hopper when his initial report had been made. Clark indicated that the report had been obtained from Manheim Auto Auction and was "*likely* reviewed by Defendants at the time of the sale." (Emphasis added.) The Condition Report submitted by Hopper had not been presented to Odeh during his deposition. The Condition Report LAM viewed prior to purchasing the BMW at auction was also not produced during Odeh's deposition. It is therefore unclear whether the Condition Report referenced by each party is the same document or whether there are multiple Condition Reports on the BMW.

6. Affiant further states that after the subject vehicle was shipped to him in Texas it twice failed state air quality inspections which, to date, has prevented him from registering it;

7. Affiant further states that thereafter he took the subject vehicle to a local BMW dealer where he learned that it lacked catalytic converters, oxygen sensors and came equipped with software designed to disguise the lack of such equipment;

8. Affiant states further that such information was concealed and/or not revealed to him prior to the sale;

. . .

13. Affiant states further that prior to purchasing the subject vehicle he did hire the Lemon Squad to perform an inspection which generated a report informing affiant that the vehicle had an aftermarket exhaust. Affiant states further that he didn't equate an aftermarket exhaust with the lack of emission control equipment because he has owned vehicles with aftermarket exhaust and they have all been in compliance with federal and state law. . . .

{¶ 14} Clark, Hopper's expert, is a self-proclaimed "car enthusiast" with over 30 years of automotive and mechanical experience. He is a certified master automotive technician, a certified medium and heavy truck technician, and a certified Vermeer equipment advanced level technician. He holds a Texas All-Lines Insurance Adjuster license and was previously a licensed Texas vehicle inspector. In 2017, following years employed in the automotive repair and heavy machinery industries, he opened his own business. Clark's business specializes in drivetrain modernization of classic cars and trucks and Clark personally performs prepurchase vehicle inspections for customers. Clark conducted an inspection of the BMW purchased by Hopper and reviewed the vehicle's Carfax history report, various documents obtained from Manheim Auto Auction

regarding the vehicle, the deposition of Odeh, the pleadings filed in the case, and discovery responses from LAM and Hopper. On February 24, 2024, Clark issued an initial report in which he indicated he used a "handheld OBDII scanner" when inspecting the vehicle and the device indicated "the presence of 2 fault codes and 2 incomplete emissions monitors." Clark detailed the findings of his inspection of the vehicle and opined, in pertinent part, as follows:

> It is my belief, after examining all documentation regarding this case, visually inspecting, and interrogating the vehicle's powertrain control module, that any automotive dealer selling this vehicle should have been aware of these modifications described herein [that is, the removal of the catalytic converters and oxygen sensors and the installation of non-factory software intended to circumvent cursory indications that tampering had been done]. . . .

> To hear a vehicle with an exhaust note as loud and aggressive as the one purchased by Plaintiff and which I observed and not to perform both a visual inspection of the exhaust system, as well as spending 5 minutes with the diagnostic scanner Defendant has asserted [it] owned in [Odeh's] deposition, constitutes willful ignorance and/or gross negligence. . . .

> Defendant testified that [it] did not feel the need for an OBD diagnostic scan because the check engine light did not illuminate. This is not an excuse for failing to utilize a diagnostic device in examining the subject vehicle and, again, constitutes gross negligence on the part of the Defendant where it is clear that it wished to remain willfully ignorant of the tampering described herein. If Defendant does not practice an OBD scan of every vehicle it purchases, as a rule, at a minimum, the volume level of the exhaust system of the subject automobile should have aroused enough suspicion to do a visual inspection and scan [of] the vehicle's powertrain control module to determine if there were modifications that could violate any number of EPA or state emissions regulations.

{¶ 15} On April 5, 2024, Clark supplemented his expert report, indicating that he had been "provided with a Condition Report . . . by Plaintiff received from Manheim Auto Auction available to and likely reviewed by Defendants at the time of the sale to them which was not in the possession of the Plaintiff and counsel at the time I gave my original report." Clark noted that on the first page of the Condition Report, under the "Remarks/Comments" section, there was a notation of "Tuned, Stage 1." Clark indicated,

> [i]n the performance automotive aftermarket, the descriptor "Tuned" references changes being made to the software programming in the factory control module in an effort to increase performance and/or circumvent emissions monitoring systems that would typically detect tampering had occurred with original factory emissions control equipment.
>
> This fact, in concert with those contained in my initial report, show that Defendant should have been acutely aware of the modifications to this vehicle before marketing and selling said vehicle to the general public and, ultimately, the Plaintiff without disclosing that it had been modified or investigating further, the nature, extent, and legality of those modifications.

Clark did not explain what the term "Stage 1" meant in connection with the word "Tuned" as it appeared on the Condition Report. His report also did not address the "Mechanical" portion of the Condition Report which indicated that the "EMISSIONS/CATALYTIC/EXHAUST" had "Factory Equipment Installed" or the "Diagnostic Trouble Codes & Warning Lights" portion of the report that indicated there were "No Active Codes." Finally, Clark's report did not address, or even mention, the Lemon Squad's inspection of the BMW.

{¶ 16} On June 25, 2024, the trial court issued a decision granting LAM's motion for summary judgment on Hopper's CSPA and fraud claims. The trial court found that LAM had not engaged in unfair or deceptive acts or statements when selling the BMW to

Hopper. The statements LAM or its representatives made to Hopper about the BMW being "Freshly Serviced, Inspected and Ready to go" and "amazing" were either true statements or permissible puffery. The trial court reasoned,

> It is undisputed that Defendant sold the subject vehicle to Plaintiff without disclosing the vehicle lacked oxygen sensors or catalytic converters. . . . However, the issue before this Court is whether the representations made by Defendant to Plaintiff were deceptive or unfair. The Court finds they were not. The assertion that the subject vehicle was "freshly serviced, inspected and ready to go" was truthful. Defendant had Bob Sumerel Tire & Service . . . inspect the Vehicle prior to Sale. . . .
>
> [T]h[e] statement [that the vehicle was "freshly serviced, inspected and ready to go"] is *not* a verification made by third parties that would suggest there is no need to inspect the vehicle. Plaintiff has presented no evidence that he relied on Defendant's statements. In fact, to the contrary, the evidence establishes that prior to sale, instead of relying on Defendant's statements, Plaintiff had his own independent inspection of the vehicle conducted by the Lemon Squad. . . . Defendant's statements did not become a part of the bargain because it was only after the Lemon Squad inspection that Plaintiff entered an "as is" sales contract with Defendant. Plaintiff considered the source and conducted his own independent inspection of the vehicle and did not simply rely on the statements made by Defendant. The Court finds these statements were puffery or truthful. They are not misleading. The Court also finds that Plaintiff did not rely on Defendant's statements, as he had the vehicle independently inspected. Therefore, the statements made by Defendant are not violations of the CSPA.

{¶ 17} As for Hopper's claim that LAM had engaged in unconscionable acts in violation of R.C. 1345.03 of the CSPA, the court noted that the statute requires that the supplier "knowingly" commit the act that violates the statute. The court found that Hopper

- 11 -

failed to present any evidence that LAM had knowledge of the missing catalytic converters or knowledge that the BMW would fail inspection in Texas and could not be registered. The trial court explained,

> Plaintiff has presented no evidence that Defendant had knowledge of the missing catalytic converters. Defendant had the vehicle inspected and no issues with the catalytic converters were discovered or that the vehicle would fail inspection in the State of Texas. Plaintiff's own inspection by the Lemon Squad noted potential issues with the exhaust. Plaintiff used this information to negotiate a sales price "as is" and even noted to Defendant the concern of the aftermarket exhaust passing Texas noise ordinance requirements. While Plaintiff asserts, through his expert, that Defendant "should have known" the vehicle lacked catalytic converters, the inspections prior to sale did not reveal these issues. The Court finds that there is no evidence that Defendant knew of the missing catalytic converters or that the vehicle would fail inspection in a different state. Therefore, there is no evidence that Defendant knew or should have known of Plaintiff's inability to receive a substantial benefit.

{¶ 18} Finally, with respect to Hopper's fraud claim, the trial court found LAM had not made any false statements to Hopper regarding the vehicle's condition. Rather, "the statements made by Defendant regarding the subject vehicle's condition were true statements or permissible puffery and not factual representations as to the actual condition of the vehicle." The court further found there was no evidence that LAM sought to deceive or mislead Hopper as to the condition of the vehicle. Rather, LAM allowed Hopper to have the vehicle independently inspected by the Lemon Squad. Despite being made aware there were exhaust issues that would need to be addressed once he was in possession of the vehicle, Hopper nonetheless chose to purchase the vehicle "as is" from LAM. The trial court therefore entered summary judgment in favor of LAM on all of

Hopper's claims.

## II. ANALYSIS

{¶ 19} Hopper appealed the trial court's decision, raising the following as his sole assignment of error:

{¶ 20} THE TRIAL COURT ERRED WHEN IT IMPROPERLY GRANTED [LAM'S] MOTION FOR SUMMARY JUDGMENT.

{¶ 21} Hopper argues the trial court erred when it granted summary judgment to LAM on his claims for fraud and for unconscionable acts under R.C. 1345.03 of the CSPA. Hopper does not challenge the trial court's finding that LAM was entitled to judgment on Hopper's claims of unfair or deceptive acts under R.C. 1345.02 of the CSPA.

### A. Summary Judgment Standard

{¶ 22} "An appellate court's examination of a trial court's decision to grant summary judgment is subject to de novo review." *French v. New Paris*, 2011-Ohio-1309, ¶ 17 (12th Dist.), citing *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). De novo review means that this court uses the same standard that the trial court should have used and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial. *Morris v. Dobbins Nursing Home*, 2011-Ohio-3014, ¶ 14 (12th Dist.).

{¶ 23} Civ.R. 56 sets forth the summary judgment standard. "Pursuant to that rule, a court may grant summary judgment only when (1) there is no genuine issue of any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) the evidence submitted can only lead reasonable minds to a conclusion that is adverse to the nonmoving party." *Spitzer v. Frisch's Restaurants, Inc.*, 2021-Ohio-1913, ¶ 6 (12th Dist.), citing *BAC Home Loans Servicing, L.P. v. Kolenich*, 2011-Ohio-3345, ¶ 17 (12th Dist.). "A

material fact is one which would affect the outcome of the suit under the applicable substantive law." *Hillstreet Fund III, L.P. v. Bloom*, 2010-Ohio-2961, ¶ 9 (12th Dist.), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

{¶ 24} The party moving for summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists. *Touhey v. Ed's Tree & Turf, LLC*, 2011-Ohio-3432, ¶ 7 (12th Dist.), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996). Once this burden is met, the nonmoving party "'must then rebut the moving party's evidence with specific facts showing the existence of a genuine triable issue; it may not rest on the mere allegations or denials in its pleadings.'" *Oliphant v. AWP, Inc.*, 2020-Ohio-229, ¶ 31 (12th Dist.), quoting *Deutsche Bank Natl. Trust Co. v. Sexton*, 2010-Ohio-4802, ¶ 7 (12th Dist.). "Summary judgment is proper if the nonmoving party fails to set forth such facts." *Taylor v. Atrium Med. Ctr.*, 2019-Ohio-447, ¶ 10 (12th Dist.). "In determining whether a genuine issue of material fact exists, the evidence must be construed in favor of the nonmoving party." *Id.*

{¶ 25} "Civ.R. 56(C) provides an exclusive list of materials that a trial court may consider when deciding a motion for summary judgment." *State ex rel. Varnau v. Wenninger*, 2011-Ohio-3904, ¶ 7 (12th Dist.), citing *Spier v. American Univ. of the Caribbean*, 3 Ohio App.3d 28, 29 (1st Dist. 1981). Those materials are "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact." Civ.R. 56(C). "[A] party may properly introduce evidence not specifically authorized by Civ.R. 56(C) by incorporating it by reference through a properly framed affidavit pursuant to Civ.R. 56(E)." *Wilson v. AIG*, 2008-Ohio-5211, ¶ 29 (12th Dist.); *Wenninger* at ¶ 7.

{¶ 26} "'In general, no evidence or stipulation may be considered in ruling on a summary judgment motion except as stated in Civ.R. 56.'" *Fontain v. H&R Cincy Properties, L.L.C.*, 2022-Ohio-1000, ¶ 66, fn. 7 (12th Dist.), quoting *U.S. Bank Natl. Assn. v. Crow*, 2016-Ohio-5391, ¶ 18 (7th Dist.). However, a trial court may, in its discretion, consider documents other than those enumerated in Civ.R. 56(C) if there has been no objection by the opposing party. *Meranda Nixon Estate Wine, L.L.C. v. Cherry Fork Farm Supply Co.*, 2024-Ohio-1523, ¶ 47 (12th Dist.); *Grizinski v. Am. Express Fin. Advisors, Inc.*, 187 Ohio App.3d 393, 2010-Ohio-1945, ¶ 18 (12th Dist.). "'[T]he failure of a party to move to strike or otherwise object to documentary evidence submitted by an opposing party in support of or in opposition to a motion for summary judgment waives any error in considering such evidence under Civ.R. 56(C).'" *Meranda Nixon* at ¶ 47, quoting *Payne v. Rumpke*, 2023-Ohio-4760, ¶ 21, fn. 7 (4th Dist.).

{¶ 27} In the present case, both Hopper and LAM attached various exhibits to their respective memorandums in support or in opposition to summary judgment that were not incorporated by reference through an affidavit and are not the type of materials enumerated in Civ.R. 56(C). Included among those exhibits are the Lemon Squad Report, Autobahn BMW's report and estimate, Clark's expert report and addendum to the expert report, and a Condition Report for the vehicle. Neither party moved to strike those exhibits from consideration or objected to the court considering the exhibits in determining whether summary judgment was appropriate. It appears that the trial court considered these exhibits in ruling on LAM's motion for summary judgment, mentioning some of the exhibits by name. The trial court acted within its discretion in considering the Civ.R. 56(C) nonconforming exhibits and this court will likewise consider such exhibits in determining

whether summary judgment was properly entered in LAM's favor. *See Meranda Nixon* at ¶ 48.

## B. CSPA Claim – R.C. 1345.03

{¶ 28} "The Consumer Sales Practices Act is a remedial law which is designed to compensate for traditional consumer remedies and . . . must be liberally construed pursuant to R.C. 1.11." *Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27, 29 (1990). The CSPA, set forth in R.C. Chapter 1345, "prohibits suppliers from committing either unfair or deceptive consumer practices or unconscionable acts or practices as cataloged in R.C. 1345.02 and 1345.03." *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 24. The Act defines a "supplier" as a "seller . . . engaged in the business of effecting or soliciting consumer transactions." R.C. 1345.01(C). A "consumer transaction" is a "sale . . . of an item of goods . . . to an individual for purposes that are primarily personal." R.C. 1345.01(A).

{¶ 29} As relevant to the present appeal, R.C. 1345.03 prohibits suppliers from "commit[ting] an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." R.C. 1345.03(A). "'[U]nconscionable acts or practices' relate to a supplier manipulating a consumer's understanding of the nature of the transaction at issue." *Johnson* at ¶ 24. R.C. 1345.03(B) sets forth a list of considerations for determining whether a supplier engaged in an unconscionable act or practice. These considerations include

> (3) Whether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;

. . .

> (6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment[.]

R.C. 1345.03(B)(3) and (6).

{¶ 30} "'[T]o recover under R.C. 1345.03, a consumer must show that a supplier acted unconscionably and knowingly.'" *Price v. Evans Auto Repair, Inc.*, 2024-Ohio-5108, ¶ 17 (10th Dist.), quoting *Hanna v. Groom*, 2008-Ohio-765, ¶ 36 (10th Dist.). *See also Rupp v. Premier Health Partners*, 2025-Ohio-986, ¶ 33 (2nd Dist.); *Grayson v. Cadillac Builders*, 1995 Ohio App. LEXIS 3954, *10-11 (8th Dist. Sept. 14, 1995) ("While proof of intent is not required to prove deception under R.C. 1345.02, proof of knowledge is a requirement to prove an unconscionable act under R.C. 1345.03"). Pursuant to R.C. 1345.01(E), "knowledge" is defined as "*actual awareness*, but such actual awareness may be inferred where objective manifestations indicate that the individual involved acted with such awareness." (Emphasis added.) "'[K]nowingly' committing an act or practice in violation of R.C. Chapter 1345 means that the supplier need only intentionally do the act that violates the Consumer Sales Practices Act. The supplier does not have to know that his conduct violates the law. . . ." *Einhorn*, 48 Ohio St.3d at 30.

{¶ 31} Hopper argues that a genuine issue of material fact exists as to whether LAM mislead him into purchasing the BMW knowing that he would not receive a substantial benefit from the purchase. Specifically, Hopper maintains that Clark's expert report raises an issue of fact as to whether LAM knew or should have known of the missing emission control equipment that prevented him from passing inspection and registering the vehicle in Texas. Clark's expert report indicates that "any automotive

dealer" selling the BMW should have been aware of the missing catalytic converters and oxygen sensors and the installation of non-BMW aftermarket software designed to disguise the missing parts due to vehicle's "loud and aggressive" exhaust and the notation on the BMW's Condition Report which indicated the vehicle had been "Tuned." Clark opined that LAM's failure to personally hook up a diagnostic scanner to the BMW under these circumstances was proof that LAM made itself "willfully ignorant of the tampering" and acted unconscionably in the sale of the BMW.

{¶ 32} Having reviewed the evidence submitted in support and opposition to LAM's motion for summary judgment, we find that the trial court did not err in granting summary judgment to LAM on Hopper's claim for unconscionable acts under R.C. 1345.03. Contrary to Hopper's assertions, a "should have known" standard does not apply to claims of unconscionable acts or practices under R.C. 1345.03. Rather, as set forth above, claims of unconscionable acts or practices require that the seller have knowledge. That is, the seller must have "actual awareness" or there must be "objective manifestations indcat[ing] that the individual involved acted with such awareness." R.C. 1345.01(E). Here, the evidence produced by LAM demonstrates that it did not commit an unconscionable act or practice in the sale of the BMW as it did not know that the vehicle was missing catalytic converters and oxygen sensors or that non-BMW aftermarket software had been installed to conceal the missing emission control equipment. LAM introduced evidence that it had the vehicle inspected and serviced at Bob Sumerel Tire & Service after purchasing it at auction. The service records from Bob Sumerel do not indicate the vehicle was missing emission control equipment. Hopper then had the vehicle inspected by the Lemon Squad before he agreed to purchase the vehicle. After hooking

up a "scan tool" to the vehicle's computer system and finding "no current or pending codes," the Lemon Squad indicated the "vehicle appears to be in working order." The Lemon Squad advised Hopper that there was an aftermarket exhaust installed. With this knowledge, Hopper agreed to purchase the vehicle "as is."

{¶ 33} Neither the condition report nor Clark's expert report create an issue of fact regarding LAM's knowledge of the missing catalytic converters and oxygen sensors or the use of non-BMW aftermarket software to conceal the missing equipment. Even assuming the Condition Report attached to Hopper's memorandum in opposition to summary judgment is the same Condition Report LAM viewed prior to its purchase of the BMW at auction, the report does not raise an issue of fact as to whether LAM had knowledge or was actually aware of the missing emission control equipment. The Condition Report presented by Hopper indicated the BMW had "no active" diagnostic trouble codes or warning lights and the vehicle's "EMISSIONS/CATALYTIC/EXHAUST" had "Factory Equipment Installed." The Condition Report, therefore, failed to indicate there was anything wrong with the vehicle or that the vehicle was missing emission control equipment. The reference to the vehicle being "Tuned, Stage 1" did not affirmatively indicate the vehicle's emission control equipment had been removed. Rather, as Clark's expert report indicates, the vehicle being "Tuned" could amount to the vehicle's performance being increased by changes made to the software programming in the factory control module.

{¶ 34} Though Hopper's expert claimed LAM should have used the diagnostic scanner it owned to discover the missing emission control equipment, there is no evidence that use of the scanner would have revealed the missing equipment. A scan tool

was used by the Lemon Squad during its inspection of the BMW and the scan found "no current or pending codes."

{¶ 35} LAM has demonstrated that Hopper cannot prevail on his claim for unconscionable acts in violation of R.C. 1345.03 as the evidence it submitted demonstrated it did not have knowledge of the missing emission control equipment when it sold the BMW to Hopper. In fact, the evidence submitted by both parties indicates that use of a diagnostic scanner and multiple inspections of the BMW did not reveal that the vehicle's emission control equipment had been removed. LAM has therefore demonstrated that it did not act unconscionably in its sale of the BMW to Hopper. LAM did not mislead Hopper into purchasing the BMW knowing that he would not receive a substantial benefit from his purchase due to his inability to register the vehicle in Texas. *See, e.g., Schneider v. Miller*, 73 Ohio App.3d 335, 340 (3d Dist. 1991) (finding a trial court properly entered judgment in favor of a used car dealership where the plaintiff-purchaser failed to present evidence that the seller had knowledge of the alleged defect in the car or that it had attempted to conceal such defect). The trial court did not err in granting LAM summary judgment on Hopper's claim for damages under R.C. 1345.03.

### C. Fraud Claim

{¶ 36} Hopper argues the trial court erred by granting LAM summary judgment on his claim for fraud. Specifically, Hopper argues that issues of fact exist regarding whether statements LAM made about the condition of the vehicle were false or were "made with willful blindness constituting gross negligence in failing to take any action which would have easily made [it] aware of the vehicle's actual condition in lacking emission control equipment."

{¶ 37} To establish a claim of fraud, a plaintiff must prove there was (1) a representation or, where there is a duty to disclose, a concealment of a fact, (2) which is material to the transaction, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to its truth or falsity that knowledge may be inferred, (4) with the intent of misleading another to rely on it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *Adena at Miami Bluffs Condominium Owners' Assn., Inc. v. R. Hugh Woodward*, 2021-Ohio-3872, ¶ 32 (12th Dist.); *Avila v. Hughes*, 2021-Ohio-2463, ¶ 35 (12th Dist.).

{¶ 38} "An action for fraud may be grounded upon failure to fully disclose facts of a material nature where there exists a duty to speak." *Layman v. Binns*, 35 Ohio St.3d 176, 178 (1988). The Ohio Supreme Court has recognized that a used car dealer has a duty to disclose certain facts, even when selling the vehicle "as is." The Court held that "[w]here a used car dealer sells a vehicle 'as is' he is under a duty to use ordinary care to warn the purchaser of defects of which he has, or by the exercise of reasonable care should have, knowledge." *Stamper v. Parr-Ruckman Home Town Motor Sales, Inc.*, 25 Ohio St.2d 1 (1971), syllabus.

{¶ 39} Following our review of the evidence, we find that summary judgment was appropriately entered in LAM's favor on Hopper's fraud claim. LAM demonstrated that Hopper cannot prevail on his fraud claim as he cannot show that LAM made any false representations about the BMW. As previously discussed, there is no indication in the record that LAM knew of the missing catalytic converters and oxygen sensors or knew that non-BMW aftermarket software had been installed to conceal the missing equipment. There is also no evidence that LAM acted recklessly or with utter disregard as to whether

the vehicle was missing emission control equipment. Rather, the record reveals that once the BMW was purchased at auction, LAM had the vehicle inspected and serviced at Bob Sumerel Tire & Service. The service report did not indicate any issues with the vehicle's emission control system.

{¶ 40} There was also no evidence that LAM concealed any material fact concerning the BMW or that it had the intent to mislead Hopper into purchasing the BMW. Rather, LAM permitted Hopper to conduct his own inspection of the vehicle, with an inspector selected and hired by Hopper. This inspection resulted in the disclosure of an aftermarket exhaust being installed on the vehicle. Hopper used the knowledge of the aftermarket exhaust to negotiate with LAM over the price of the vehicle before ultimately purchasing the vehicle "as is." LAM has therefore demonstrated it is entitled to summary judgment on Hopper's fraud claim.

### III. CONCLUSION

{¶ 41} LAM met its burden of demonstrating that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law on Hopper's claim of unconscionable acts under R.C. 1345.03 of the CSPA and his claim for fraud. Hopper failed to present evidence indicating LAM had knowledge of the missing emission control equipment, that it concealed the missing equipment, or that it intended to mislead Hopper in its sale of the BMW. Hopper's sole assignment of error is, therefore, overruled and the decision of the trial court granting summary judgment to LAM is hereby affirmed.

BYRNE and SIEBERT, JJ. concur.